# 24-0969-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

EIG ENERGY FUND XIV, L.P., EIG ENERGY FUND XIV-A, L.P., EIG
ENERGY FUND XIV-B, L.P., EIG ENERGY FUND XIV (CAYMAN), L.P., EIG
ENERGY FUND XV, L.P., EIG ENERGY FUND XV-A, L.P., EIG ENERGY
FUND XV-B, L.P., EIG ENERGY FUND XV (CAYMAN), L.P.,

*Plaintiffs-Appellants,*

– v. –

KEPPEL OFFSHORE & MARINE LTD.,

*Defendant-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR PLAINTIFFS-APPELLANTS EIG

DANIEL B. GOLDMAN
KERRI ANN LAW
CLAUDIA PAK
DANIEL M. KETANI
KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Attorneys for Plaintiffs-Appellants EIG*
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Plaintiffs-Appellants EIG Energy Fund XIV, L.P., EIG Energy Fund XIV-A, L.P., EIG Energy Fund XIV-B, L.P., EIG Energy Fund XIV (Cayman), L.P., EIG Energy Fund XV, L.P., EIG Energy Fund XV-A, L.P., EIG Energy Fund XV-B, L.P., and EIG Energy Fund XV (Cayman), L.P., hereby certify that they have no parent corporation, and no publicly held corporation owns 10% or more of their stock.

# **TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES ................................................................... iv

INTRODUCTION .............................................................................1

JURISDICTION...............................................................................6

STATEMENT OF THE ISSUES................................................................6

STATEMENT OF THE CASE.................................................................7

I.     KEPPEL GATHERED KNOWLEDGE ON ITS NEW CRIMINAL PARTNER:  SETE ..........................................................................7

     A.     The Circumstances Surrounding EIG's August 2011 Visits to Keppel's Shipyard ...............................................................9

     B.     The Circumstances Surrounding EIG's March 2012 Visit to Keppel's Shipyard ...............................................................15

II.     KEPPEL ENABLED THE FRAUD TO CONTINUE THROUGH SHAM CONSULTING AGREEMENTS ....................................................17

III.     PETROBRAS AND SETE CONCEALED THE BRIBERY FROM EIG...........................................................................................19

IV.     AFTER EIG'S INVESTMENTS BEGAN, KEPPEL'S CONDUCT PROLONGED THE FRAUD..........................................................20

     A.     The Circumstances Surrounding EIG's June 2013 Visit to Keppel's Shipyard ...............................................................20

     B.     Keppel Concealed the Bribery from BNDES, Prolonging the Fraud...............................................................................21

SUMMARY OF ARGUMENT .................................................................23

STANDARD OF REVIEW ...................................................................24

ARGUMENT ................................................................................25

I.     THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO KEPPEL ON ACTUAL KNOWLEDGE........................25

     A.     A Reasonable Juror Could Infer Keppel's Knowledge of the Fraud From The Surrounding Circumstances .....................................27

B.    The District Court Applied the Wrong Legal Standard to this Element ................................................................................ 29

C.    The District Court Failed to Consider Keppel's Extraordinary Economic Motive ................................................................ 38

II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO KEPPEL ON SUBSTANTIAL ASSISTANCE .............. 41

A.    The District Court Erred in Finding the Bribery and Its Concealment Were Attenuated .............................................. 43

B.    The District Court Improperly Confined This Element to Acts Concerning the Preparation of Fraudulent Statements Only ............. 49

    1.    Keppel Affirmatively Assisted and Helped Conceal the Fraud Through the Shipyard Visits ........................... 52

    2.    Keppel's Sham Consulting Agreements and Concealment of Bribes Furthered the Fraud ................................... 56

    3.    Keppel Executed EPC Contracts Incorporating Misrepresentations from Petrobras/Sete ................................... 58

    4.    Keppel Aided the Fraud by Preparing Anti-Corruption Declarations ............................................................... 60

CONCLUSION ........................................................................................ 63

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*,
  957 F. Supp. 1308 (S.D.N.Y. 1997) ...........................................43, 45, 48 n.8, 55

*Abu Dhabi Com. Bank v. Morgan Stanley & Co.*,
  888 F. Supp. 2d 431 (S.D.N.Y. 2012) ................................................................59

*Accent Delight Int'l Ltd. v. Sotheby's*,
  2023 WL 2307179 (S.D.N.Y. Mar. 1, 2023)................................................38, 53

*Aetna Cas. and Sur. Co. v. Leahey Constr. Co.*,
  219 F.3d 519 (6th Cir. 2000) ...................................................28, 35, 36

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................25

*Bankers Conseco Life Ins. Co. v. KPMG LLP*,
  189 A.D.3d 402 (1st Dep't 2020) ......................................................................53

*Bullen v. CohnReznick, LLP*,
  194 A.D.3d 637 (1st Dep't 2021) ......................................................................39

*Chemtex, LLC v. St. Anthony Enters., Inc.*,
  490 F. Supp. 2d 536 (S.D.N.Y. 2007) ..........................................................40, 41

*Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*,
  62 F.4th 748 (2d Cir. 2023) ...............................................................................24

*Cupersmith v. Piaker & Lyons P.C.*,
  2016 WL 5394712 (N.D.N.Y. Sept. 27, 2016), *aff'd sub nom.
  Ayers v. Piaker & Lyons, P.C.*, 748 F. App'x
  368 (2d Cir. 2018)....................................................................34, 38, 56, 57, 59

*In re Dana Corp.*,
  574 F.3d 129 (2d Cir. 2009) ..................................................................24, 25, 63

*de Abreu v. Bank of America Corp.*,
  812 F. Supp. 2d 316 (S.D.N.Y. 2011) ...............................................................40

iv

*Eastman Kodak Co. v. Camarata*,
    2006 WL 3538944 (W.D.N.Y. Dec. 6, 2006) ...............................56, 57

*EIG Energy Fund XIV, L.P. v. Keppel Offshore & Marine Ltd.*,
    --- F. Supp. 3d ---, 2024 WL 1195575 (S.D.N.Y. Mar. 20, 2024) ................7, 44

*EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*,
    621 F. Supp. 3d 30 (D.D.C. 2022), *aff'd*, 104 F.4th 287
    (D.C. Cir. 2024) ...............................................................................47

*Elbit Sys., Ltd. v. Credit Suisse Grp.*,
    917 F. Supp. 2d 217 (S.D.N.Y. 2013) ..............................................61

*FDIC v. First Interstate Bank of Des Moines, N.A.*,
    885 F.2d 423 (8th Cir. 1989) .....................................................28, 36

*Fed. Hous. Fin. Agency v. Nomura Holdings Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017) ............................. 23, 26, 29, 31, 33, 37

*Gabriel Cap., L.P. v. NatWest Fin., Inc.*,
    94 F. Supp. 2d 491 (S.D.N.Y. 2000) ...............................28, 51, 53, 55

*Global Mins. & Metals Corp. v. Holme*,
    35 A.D.3d 93 (1st Dep't 2006) ........................................................41

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983)........................................................36

*Johnson v. Nextel Commc'ns, Inc.*,
    660 F.3d 131 (2d Cir. 2011) ......................................................27 n.2

*JP Morgan Chase Bank v. Winnick*,
    406 F. Supp. 2d 247 (S.D.N.Y. 2005) ..............................................42

*Krys v. Pigott*,
    749 F.3d 117 (2d Cir. 2014) ......................................................25, 26

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*,
    2016 WL 5719749 (S.D.N.Y. Sep. 29, 2016) ....................................38

*Monsen v. Consol. Dressed Beef Co.*,
    579 F.2d 793 (3d Cir. 1978) ......................................................36, 56

*Nathel v. Siegal*,
  592 F. Supp. 2d 452 (S.D.N.Y. 2008) ..................................................... 43-45, 48

*Oster v. Kirschner*,
  77 A.D.3d 51 (1st Dep't 2010) .......................................................... 26, 35 & n.4

*In re Par Pharm., Inc. Sec. Litig.*,
  733 F. Supp. 668 (S.D.N.Y. 1990) ........................................................51, 52, 63

*Primavera Familienstifung v. Askin*,
  130 F. Supp. 2d 450 (S.D.N.Y. 2001) ........................... 33, 38, 42-45, 48 n.8, 53

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000)...................................................................................24

*Rolf v. Blyth, Eastman Dillon & Co.*,
  570 F.2d 38 (2d Cir. 1978), *opinion amended*, 1978 WL 4098 (2d
  Cir. May 22, 1978)................................................................................50

*Sheehy v. New Century Mortg. Corp.*,
  690 F. Supp. 2d 51 (E.D.N.Y. 2010) ..................................................................60

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
  346 F. Supp. 3d 473 (S.D.N.Y. 2018) ........................... 26, 28, 39, 41, 42, 50, 53

*Terrydale Liquidating Tr. v. Gramlich*,
  549 F. Supp. 529 (S.D.N.Y. 1982) ..................................................................49, 50

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023)........................................................................33, 35, 51

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012) ............................................................23, 29, 32, 33

*Washington State Inv. Bd. v. Odebrecht S.A.*,
  2023 WL 5016787 (S.D.N.Y. Aug. 4, 2023)....................................................61

*Wight v. BankAmerica Corp.*,
  219 F.3d 79 (2d Cir. 2000) ..............................................................................39

## Statutes

28 U.S.C. § 1291 ...........................................................................................6

28 U.S.C. § 1367 ................................................................................6

**Other Authorities**

Restatement (Third) of Torts: Liability for Economic
    Harm (2018) ............................................. 26, 27, 33, 41 n.6, 42, 50-51

## INTRODUCTION

Defendant-Appellee Keppel Offshore & Marine Ltd. ("**Keppel**") aided and abetted a massive fraudulent scheme in which Petróleo Brasileiro S.A. ("**Petrobras**") and Sete Brasil Participações S.A. ("**Sete**") defrauded investors, including Plaintiffs-Appellants EIG Energy Fund XIV, L.P., et al. ("**EIG**"), out of billions of dollars. Petrobras created Sete to develop, off of Petrobras's balance sheet, twenty-eight deep-water drilling rigs in Brazilian shipyards, all of which Sete would charter back to Petrobras to drill for oil off the coast of Brazil. As the cost to build each rig was in excess of $700 million, Petrobras and Sete sought to raise at least $20 billion in equity and debt capital. Keppel was contracted to build six semisubmersible drilling rigs, which constituted the largest single construction project ever undertaken by Keppel. But, what EIG and the other investors in Sete did not know was that Petrobras had extended to Sete a long-standing bribery and kickback scheme in which oil rig-builders, including Keppel, paid millions of dollars of bribes to senior executives of Petrobras and the controlling political "Workers Party" of Brazil to secure lucrative projects over at least a ten-year period. Consistent with their long-standing corruption scheme, Keppel and other rig-builders agreed to pay millions of dollars in kickbacks to Petrobras and Sete's senior executives and the Workers Party in amounts equal to 1% of the value of each construction contract, which were funded by monies from Sete's investors.

Not surprisingly, Petrobras and Sete did not disclose the bribery and kickback scheme to any of Sete's investors, including EIG. When Brazilian prosecutors discovered Petrobras and Sete's scheme, Sete's senior lenders refused to fund Sete, and the company tumbled into bankruptcy, wiping out all equity investment in Sete, including EIG's investment of $221 million. Sete became the centerpiece of the largest bribery and kickback scandal in the history of Brazil, called "Operation Car Wash," in which scores of Petrobras executives and executives from contractors were indicted and jailed in Brazil. Keppel, too, admitted to facilitating and concealing the bribery scheme, and its executive and agent pled guilty in the U.S.

Keppel does not challenge the undeniable fact that Petrobras and Sete defrauded EIG. Instead, the two issues before this Court are whether Keppel knew of Petrobras and Sete's fraud and whether Keppel substantially assisted the fraud. This Court should reverse the District Court's grant of summary judgment against EIG and find that a jury should decide both issues.

The District Court adopted an unwarranted and unduly restrictive view of the level of knowledge Keppel needed to have to incur aiding-and-abetting liability. The District Court held that Keppel needed knowledge of "specific communications made by Petrobras or Sete to EIG" or of "a general strategy by Petrobras or Sete to conceal bribery and corruption-related risks from EIG." That

holding simply ignores the reality of the fraud here, which was based not so much on affirmative representations made specifically and only to EIG, but on the non-disclosure of the bribery scheme to all of Sete's investors, including EIG. There cannot be a scintilla of doubt Keppel knew Petrobras and Sete would not disclose the bribery and kickback scheme to any potential investor, including EIG. Before Keppel agreed to pay bribes and kickbacks on its Sete contracts, Keppel had paid over $40 million in bribes and kickbacks to two senior executives of Petrobras, Renato Duque ("**Duque**") and Pedro Barusco ("**Barusco**"), and to the Workers Party over at least a ten-year period, relating to seven different massive construction projects to build oil drilling platforms. As Keppel knew, Duque, Barusco, and the Workers Party never disclosed the bribery and kickback scheme to Petrobras's investors, Petrobras's lenders or anyone in the public. To do so would have caused an abrupt end to the scheme and resulted in certain criminal prosecution, all of which occurred when the corruption actually became public.

As Keppel also knew, Petrobras and Sete never disclosed to Sete's investors or the public at large that Sete was embroiled in a massive bribery and kickback scheme. Keppel knew that Duque and Barusco, who Keppel had been paying bribes to for years, were the Petrobras employees who extended the bribery and kickback scheme to Sete. Keppel knew from prior experience that Duque and Barusco, who became Sete's COO, did not and would not disclose the bribery and

3

kickback scheme to anyone, let alone Sete's investors. But, it was not just Keppel's prior experience with paying bribes and kickbacks to Duque and Barusco that led it to this conclusion. Keppel obtained from Petrobras and Sete at least three separate pitch decks, which Petrobras and Sete had created to market the Sete investment opportunity to potential investors. Two of the presentations Keppel received had also been sent to EIG and other Sete investors. While these pitch materials disclosed the capital structure of the Sete project and other relevant details, none contained even a whiff of the bribery and kickback scheme. That Keppel knew the bribery and kickback scheme would not be disclosed to anyone, including Sete's investors, was also apparent from the extraordinary lengths Keppel itself went to conceal the scheme by, among other things, funneling its kickbacks through shell companies set up by Keppel's third-party "consultant," Zwi Skornicki ("**Skornicki**"), using phony consulting agreements. Finally, Keppel knew that EIG was one of the investors defrauded by Petrobras and Sete. EIG visited Keppel's shipyard in Brazil and met with Keppel employees on three separate occasions, and Keppel received press reports concerning EIG's investment in Sete. The issue of Keppel's knowledge should go to the jury.

The District Court also crafted an erroneous and unduly narrow standard for determining whether Keppel substantially assisted the fraud on Sete's investors, including EIG. According to the District Court, EIG had to show

Keppel's involvement "in the making of the fraudulent misstatements themselves." That is not the law. As an initial matter, where a highly interdependent scheme exists in which all parties to the scheme benefited from the fraudulent activity, a defendant may substantially assist the fraud by actively assisting the scheme itself, as opposed to assisting in the preparation of fraudulent documents. In denying Keppel's motion to dismiss, the District Court held that EIG sufficiently alleged such an interdependent scheme. Notwithstanding the fact that EIG proved its allegations at summary judgment, the District Court effectively reversed itself, and found that an interdependent scheme did not exist. In any event, there is a wellspring of support in investment fraud cases that substantial assistance can take many forms that do not involve the preparation of fraudulent documents. Indeed, that Keppel met with EIG on three separate occasions at its shipyard in Brazil – on two occasions before EIG executed the Sete Investment Agreement and began investing in Sete, and one before EIG had completed funding its investment – is more than sufficient to establish that Keppel provided substantial assistance to Petrobras and Sete's fraud. These visits facilitated EIG's due diligence efforts and legitimized the Sete project by providing EIG comfort that Keppel's rigs could be built in Brazil, reducing the perception of risk in the project. And, of course, Keppel did not tell EIG during these visits that it was embarking on a massive bribery and kickback scheme with regard to each rig it would build for Sete.

Keppel, moreover, substantially assisted the fraud by concealing its involvement in the bribery and kickback scheme. Keppel concealed the true nature of its kickbacks by laundering them through phony shell companies and consulting contracts with Skornicki. Keppel further concealed its kickbacks by affirming in construction contracts with Sete that it complied with all applicable laws, including anticorruption laws, and providing declarations denying any corruption to Sete's senior lenders.

The District Court's grant of summary judgment against EIG should be reversed.

## JURISDICTION

The District Court properly exercised supplemental jurisdiction pursuant to 28 U.S.C. § 1367. EIG timely filed its notice of appeal on April 12, 2024. EIG appeals from a final judgment and this Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.      Whether the District Court erred in holding no reasonable juror could find Keppel had actual knowledge of the underlying fraud perpetrated against EIG.

II.     Whether the District Court erred in holding no reasonable juror could find Keppel substantially assisted the underlying fraud perpetrated against EIG.

## STATEMENT OF THE CASE[1]

EIG commenced this action in 2018, alleging aiding and abetting fraud and RICO conspiracy claims. [ECF_17_at_37-42]. On May 11, 2020, the District Court (Gardephe, J.) granted Keppel's motion to dismiss the RICO claim, but upheld the aiding and abetting fraud claim. [ECF_45_at_1-24]. The parties cross-moved for summary judgment on November 9, 2021. Dkt. Nos. 97, 104. On March 20, 2024, the District Court granted Keppel's summary judgment motion and denied EIG's summary judgment motion, and entered judgment for Keppel. *EIG Energy Fund XIV, L.P. v. Keppel Offshore & Marine Ltd.*, --- F. Supp. 3d ---, 2024 WL 1195575 (S.D.N.Y. Mar. 20, 2024); [ECF_159]. EIG appeals the decision granting Keppel's summary judgment motion and the judgment entered.

## I. KEPPEL GATHERED KNOWLEDGE ON ITS NEW CRIMINAL PARTNER: SETE

Commencing in at least 2001, Keppel paid millions of dollars of bribes to Petrobras senior executives, including Duque and Barusco, and the Workers Party to secure lucrative projects to construct off-shore oil drilling platforms. [ECF_144-2_at_8-11 ¶¶5-16]. Before Petrobras created Sete, Keppel paid approximately $40 million in bribes on at least seven massive drilling

---

[1] EIG relies on portions of the record relating to EIG's motion for summary judgment because EIG incorporated these documents by reference into EIG's opposition to Keppel's cross-motion for summary judgment.

platform projects.  *See* [ECF_151-111_at_29 ¶24, 30 ¶32, 32 ¶43, 34 ¶51, 37 ¶67; ECF_144-3_at_77 ¶511].  For thirteen years, Duque, Barusco, the Workers Party, and Keppel carefully concealed from the public this bribery and kickback scheme.  Specifically, throughout that extended time period, Keppel (i) created sham "consulting" agreements with shell companies controlled by Skornicki, and effectuated bribes to U.S. and foreign bank accounts in the names of those companies to disguise the payment of bribes; and (ii) repeatedly directed its employees to "not communica[te]" about bribes "over email," to "not disclose" scheme-related details, and to "delete email[s]" concerning kickbacks.  [ECF_151-111_at_28 ¶¶21-22, 33 ¶49, 34 ¶52; ECF_144-2_at_33 ¶88]; *see* [ECF_144-2_at_34 ¶¶92-93, 61 ¶205].  It was not until 2014 that Brazilian prosecutors began to discover the scale and details of this ongoing scheme.  [ECF_144-2_at_132 ¶448; ECF_144-3_at_62 ¶179].

In 2009, Petrobras announced that it required the construction of twenty-eight deep-water drilling rigs to explore newly-discovered oil reserves off the coast of Brazil.  *See* [ECF_144-2_at_20-21 ¶43].  Petrobras estimated each drilling rig would cost over $700 million to construct.  [ECF_151-6_at_2].  Keppel, through its Brazilian subsidiary, submitted a bid to build rigs directly to Petrobras.  [ECF_144-2_at_21 ¶¶44-45].  By the end of 2010, however, Keppel learned that Petrobras planned to move the immense financing this project required

8

off its balance sheet by creating a new entity, Sete, which would develop and own the twenty-eight drilling rigs.  [ECF_144-2_at_22 ¶48; ECF_151-6_at_2-3].

### A. The Circumstances Surrounding EIG's August 2011 Visits to Keppel's Shipyard

Starting in late 2010, Keppel obtained confidential updates from Duque and Barusco regarding Petrobras's plans for Sete.  *See* [ECF_144-2_at_22-25 ¶¶48-58, 27 ¶65, 28 ¶68].  Keppel received these updates from its agent, Skornicki, and in person.  [ECF_144-2_at_11 ¶¶15-16, 22 ¶48, 25 ¶58, 27 ¶65].  Keppel's executives who were chiefly responsible for Keppel's involvement in the bribery scheme included:

- Chong Heong Tong ("**Tong**"), Keppel's CEO until 2014.
- Yew Yuen Chow ("**YY Chow**"), former president of Keppel's U.S. subsidiary who became Keppel's Managing Director in June 2011, and then Keppel's COO and CEO in 2012 and 2014, respectively.
- Chiau Beng Choo ("**Choo**"), chairman of Keppel's board and CEO of Keppel's parent company, Keppel Corp., until 2014.
- Jeffrey Chow, Keppel's legal director.
- Kai Choong Kwok ("**Kwok**"), president of Keppel's Brazilian subsidiary who reported to Keppel.
- Tommy Sam ("**Sam**"), Keppel executive and executive of Keppel's U.S. subsidiary.

[ECF_144-2_at_11-15 ¶¶17-26, 18 ¶36, 25 ¶55, 27-28 ¶¶65-68, 38 ¶¶106-108; ECF_151-120_at_3-4].  These Keppel executives learned critical details concerning Sete, including (i) Sete's need for massive financing from "private

entities" and investment "funds"; (ii) Sete's capital structure, comprising 20% equity and 80% debt; (iii) Barusco's planned transition from Petrobras to become Sete's COO; and (iv) that Keppel would be "given" contracts for semisubmersible drilling rigs. [ECF_151-6_at_2; ECF_151-9_at_3]; *see* [ECF_144-2_at_22-24 ¶¶48-54]. Choo even met with Barusco in Brazil to learn details about Sete. [ECF_151-13_at_2; ECF_144-2_at_27 ¶65, 28 ¶68]. In January 2011, Keppel Corp.'s Chairman Boon Yang Lee directed Keppel employees to find out, "[w]ho actually owns SETE … Who are the other private entities that will own the rest of the company." [ECF_144-2_at_25 ¶56; ECF_151-9_at_2]. Choo agreed, cc'ing YY Chow and Tong, that Keppel had to "find out more." [ECF_144-2_at_25 ¶57; ECF_151-9_at_2].

Within four days, Skornicki secured a marketing presentation from Petrobras for YY Chow titled, "Drilling Rigs in Brazil Project: Presentation to Drilling Operators." [ECF_144-2_at_25 ¶58; ECF_151-10_at_3]. The Petrobras presentation was in English, contained a "Cautionary Statement for US investors," described Petrobras's plan to raise money from "Equity Investment Funds" and "Other Institutional Investors," and listed risks and mitigating factors relating to the project. [ECF_144-2_at_26-27 ¶¶59-63; ECF_151-10_at_5, 15-18]. This presentation did not, however, mention that Sete would be infused with a massive bribery and kickback scheme. [ECF_144-2_at_26 ¶61].

By at least July 2011, Keppel knew it would kick back 1% of the value of each drilling rig contract to Petrobras/Sete. In July 2011, Barusco requested that Keppel submit a proposal to construct a semisubmersible rig for Sete as part of a joint venture, in which Keppel would take a 20% equity stake, [ECF_144-2_at_29 ¶73], and requested that Keppel "keep this deal very secret." [ECF_151-23_at_4]. On July 5, Keppel internally adjusted the cost estimate for the semisubmersible rig to include, with YY Chow's input, a 2% commission fee for Skornicki. [ECF_144-2_at_32 ¶¶86-87]; *see* [ECF_156-119_at_2] (Keppel "[i]ncreas[ing] the commission to 2%"). That 2% commission fee to Skornicki included the portion Keppel had agreed to kick back. [ECF_144-2_at_11 ¶16, 14-16 ¶¶26-29, 32 ¶85, 74 ¶256]; [ECF_144-3_at_66-67 ¶191, 68 ¶195] (admitting Keppel used commission fees to Skornicki to disguise bribe payments on Sete contracts). On July 15, 2011, YY Chow executed a proposal to Sete for the construction of a semisubmersible rig for $798 million. [ECF_144-2_at_30 ¶¶75-78]. YY Chow submitted a report to Keppel Corp. on July 20, 2011, describing the bidding proposal and noting Sete would be financed by "shareholders (Brazilian pension funds, equity investment funds and other institutional funds)." [ECF_144-2_at_31 ¶¶79-80].

In the midst of Keppel's due diligence on Sete and corrupt bidding, Skornicki informed Kwok and YY Chow on July 29, 2011 that Barusco wanted to

11

bring "some investors in Sete" to visit Keppel's Brazilian shipyard ("**BrasFELS**"). [ECF_144-2_at_34 ¶¶94-96; ECF_151-25_at_2]. Kwok, cc'ing YY Chow, complied with Barusco's request. [ECF_144-2_at_35 ¶97]. Kevin Corrigan ("**Corrigan**") of EIG visited BrasFELS on August 4, 2011, during which Keppel made a presentation touting the shipyard and provided a tour of the yard. [ECF_144-2_at_35-36 ¶¶98-102; ECF_151-26_at_3]. Keppel did not disclose to Corrigan that it would be paying millions of dollars of kickbacks on its drilling rig contracts with Sete. [ECF_144-2_at_36 ¶103]. After Corrigan's visit, Sete informed Keppel that the visit "was very fruitful and our investors and employees learned a lot … The overall impression was good and reached the expected reduction in the risk perception of the project." [ECF_144-2_at_37 ¶104; ECF_151-27_at_3]. The visit was so successful that EIG filmed BrasFELS to create a video about Sete for EIG's investors. [ECF_144-2_at_39-40 ¶¶110-112]. On August 15, 2011, Barusco asked Keppel, through Skornicki, whether EIG's agent could visit BrasFELS for a "Sete film"; YY Chow authorized the visit, but insisted Keppel "be involved" and "approve the final version before release." *Id.*

On August 25, 2011, Jeffery Chow, Keppel's legal director, emailed comments to Sete regarding a draft engineering, procurement, and construction ("**EPC**") contract, which Sete had provided Keppel. [ECF_151-127_at_16-18 (75:7-77:4); ECF_144-2_at_50 ¶153]. Chow commented on provisions he knew

12

were false concerning Keppel's compliance with the law. *Id.*; [ECF_151-127_at_27 (113:10-24), 28 (115:4-24)] (Chow admitting at deposition he knew certain EPC contract provisions were false); *see* [ECF_144-2_at_48-50 ¶¶148-153]. Petrobras/Sete's draft EPC contract, and the final EPC contracts Keppel executed, falsely represented that Keppel was "not in violation of any Applicable Law" which would "materially and adversely affect its performance" under the contract. [ECF_144-2_at_48-49 ¶¶144-149, 71 ¶239, 98 ¶337]. In 2011, however, Keppel was already discussing internally plans to conceal the Sete-related bribery payments. For example, Jeffrey Chow on September 19, 2011 directed his assistant to place a message regarding "commission agreements" with Skornicki on "plain paper and pass to [Tong/YY Chow], then delete email." [ECF_144-2_at_33 ¶88; ECF_151-37_at_2].

On September 27, 2011, Choo, Tong, and YY Chow procured from a Keppel board member an English-language Petrobras presentation concerning Sete titled, "The Drilling Rigs Project: Petrobras' Strategy for its successful implementation" (the **Petrobras Drilling Presentation**"). [ECF_155-111_at_2-3; ECF_144-2_at_41 ¶115]. The document, which EIG also received and reviewed while it was conducting due diligence on Sete, contained a "Cautionary Statement for US investors," described the Sete project, listed "benefits" and risks for potential investors, but omitted any mention of the bribery and kickback scheme.

13

[ECF_155-111_at_5-6, 25-26, 31-32; ECF_144-2_at_41-43 ¶¶117-22]. That same day, Keppel submitted a proposal to Sete for the construction of six semisubmersible rigs for $4.8 billion. [ECF_144-2_at_47 ¶¶140-141].

In October 2011, Keppel requested from Sete due diligence materials "which a company would normally have[,] to seek its own board or investors approval for any investment." [ECF_151-42_at_3-4; ECF_144-2_at_44 ¶125]. Sete provided Keppel with another fraudulent marketing presentation, which EIG had also received, entitled, "Sete Brasil Participações S/A Management Presentation" ("**Sete Management Presentation**"). [ECF_144-2_at_44 ¶126, 46 ¶136]. Sam forwarded this marketing pitch to YY Chow, Kwok, and Jeffery Chow directing them to "review and see what other info we need." [ECF_151-42_at_2; ECF_144-2_at_44 ¶127]. The presentation described Sete's capital structure, touted Sete's "strategic partnership with Petrobras" and called the Sete investment a "unique opportunity." [ECF_144-2_at_45-46 ¶¶133-135; ECF_151-42_at_8-9, 12-13, 22-23]. It did not mention the bribery and kickback scheme. [ECF_144-2_at_46 ¶137].

On December 13, 2011, Skornicki informed Jeffrey Chow that he was receiving "pressure" concerning his "agreement." [ECF_144-2_at_50-51 ¶156]. The next day, Jeffrey Chow asked a Keppel employee to prepare an agreement for Skornicki related to the "Sete Project" with a "2%" commission rate. [ECF_151-

14

46_at_2; ECF_144-2_at_51 ¶157]. Two days later, Keppel, using its subsidiary Fernvale, executed its first EPC contract with Sete to build a semisubmersible rig for $809 million. [ECF_144-2_at_48 ¶¶144-146]; [ECF_151-74_at_3] (stating value). Keppel executed this contract, despite knowing it contained false representations concerning its "compliance with all Applicable Laws." [ECF_144-2_at_48-50 ¶¶148-155].

### B. The Circumstances Surrounding EIG's March 2012 Visit to Keppel's Shipyard

Keppel and Sete's efforts to execute additional EPC contracts and obtain more financing only intensified. On March 7, 2012, Tong, YY Chow, Choo, and others discussed that "Sete [was] looking to raise up to US$1b to fund the construction" of additional rigs, and Choo directed others again to "find out as much as possible!" [ECF_144-2_at_51-52 ¶¶160-62; ECF_151-52_at_2-3]. A day later, Sam informed Tong and YY Chow he had "bumped into [João] Ferraz (Sete's CEO) who told Zwi [Skornicki] that Sete [wa]s very confident of raising the funds it needs from financial institutions and funds." [ECF_144-3_at_76 ¶507; ECF_152-7_at_2]. Ferraz, too, was a participant in the bribery scheme. [ECF_144-2_at_29 ¶¶70-71]. On March 9, 2012, Tong, YY Chow, Choo, and Kwok received a press report reflecting Sete's plan to "increase its capital in more than three times," with "the entrance of new partners," including "Energy

15

Investment Group (EIG), American institutional investor of the energy area."
[ECF_144-2_at_52 ¶163; ECF_151-53_at_2-3].

Against that backdrop, on March 16, 2012, Skornicki informed Kwok
and Sam that Sete wanted to "bring one of [its] potential investors to" BrasFELS
and asked if Sete could "count on [Keppel's] usual assistance," which Kwok
authorized. [ECF_144-2_at_53 ¶¶166-167; ECF_151-54_at_3]. Sete provided
Skornicki, Sam, and Kwok with a list of attendees, which included EIG employees
Corrigan, Simon Hayden ("**Hayden**"), and Hoshrav Patel. [ECF_144-2_at_53-54
¶¶168-171; ECF_151-55_at_3]. On March 28, 2012, EIG visited Keppel's
shipyard as part of a due diligence trip. [ECF_144-2_at_54 ¶172]. The purpose of
the visit was "to give [potential Sete investors] comfort that these ships could be
built in Brazil." [ECF_151-130_at_11 (84:11-14); ECF_144-2_at_55 ¶174].
Hayden testified the visit lasted two to three hours and included a presentation in
English with a slide show, a "free-flowing conversation" and "question and answer
session," and a tour of the "whole shipyard." [ECF_151-130_at_10 (83:13), 12-13
(85:2-86:3), 14 (87:4-12)]. Keppel did not disclose the bribery and kickback
scheme during this visit. [ECF_144-2_at_55 ¶175].

## II.    KEPPEL ENABLED THE FRAUD TO CONTINUE THROUGH SHAM CONSULTING AGREEMENTS

While coordinating EIG's second visit, on March 22, 2012, Keppel executed a letter of intent with Sete to build five additional semisubmersible rigs. [ECF_144-2_at_56 ¶177].  On March 29, the day after EIG visited BrasFELS, Sete approved the issuance of new shares, making space for new investors.  [ECF_144-2_at_122 ¶411].  Skornicki immediately informed Keppel the next day he was receiving "pressure from [his] partners about [his] contract," and that Keppel would soon receive "the first payment for the 5 units."  [ECF_144-2_at_56-62 ¶¶178-179; ECF_151-56_at_2].  Jeffrey Chow, Skornicki, and others planned Keppel's concealment of the kickbacks relating to the forthcoming EPC contracts for months, as the "value" was "very huge to justify."  [ECF_144-2_at_57 ¶185]; *see* [ECF_144-2_at_56-62 ¶¶180-210; ECF_151-60_at_2-4].  In April 2012, Skornicki established a new shell company called Deep Sea Oil to facilitate Keppel's concealment of Sete-related bribes.  [ECF_144-2_at_57 ¶181, 58 ¶191].

On August 2, 2012, Keppel executed five additional EPC contracts for $4.1 billion, knowing the contracts falsely represented Keppel would comply with "Applicable Law."  [ECF_144-2_at_70-71 ¶¶238-239]; [ECF_151-74_at_3] (stating value).  The EPC contracts Keppel secured through Sete collectively represented "the biggest contract that Keppel had ever entered into in its history."  [ECF_144-2_at_71 ¶240; ECF_151-139_at_46 (381:14-23)].  Indeed, in less than

17

one year, Keppel secured six contracts from Sete by paying bribes, whereas between 2001 and 2010, Keppel had acquired seven contracts from Petrobras through bribery and kickbacks. [ECF_144-2_at_48 ¶144, 70 ¶238]; [ECF_144-3_at_77 ¶511].

Soon after, on August 7, 2012, Keppel executed two sham "consulting" agreements with Skornicki: (i) an agreement falsely dated December 1, 2011 between Fernvale and Deep Sea Oil, providing Skornicki a commission fee of 1.5%; and (ii) an agreement falsely dated November 30, 2011 between Fernvale and another Skornicki company, Eagle do Brasil, with a 0.5% fee (together, the "**Consulting Agreements**"). [ECF_144-2_at_58 ¶191, 61-63 ¶¶208-14; ECF_151-71_at_7; ECF_151-72_at_3]. The Consulting Agreements were an "important part of the bribery scheme" and were intended to make Keppel's "consulting" fees to Skornicki appear legitimate. [ECF_144-2_at_14-15 ¶¶26-27, 63 ¶¶215-16]. They "falsely represented that payments were being made" for Skornicki's consulting services "when, in fact, portions of these payments were being paid as bribes." [ECF_144-2_at_15-16 ¶¶28-29, 64-69 ¶¶217-232]. Keppel knew that once it "received milestone payments from Sete for the construction of its drillships, Keppel [would make] commission payments to Zwi Skornicki's companies," and Skornicki, in turn, would pass on a portion of that payment as

kickbacks to Petrobras/Sete executives, on Keppel's behalf.  [ECF_144-3_at_68 ¶195; ECF_144-2_at_74 ¶256].

## III.  PETROBRAS AND SETE CONCEALED THE BRIBERY FROM EIG

Petrobras and Sete fraudulently induced EIG to invest in Sete.  As part of EIG's due diligence process, EIG reviewed and relied on numerous documents, models, and marketing materials that failed to disclose the bribery scheme, including the same Petrobras Drilling Presentation and Sete Management Presentation that Keppel received and reviewed.  [ECF_144-2_at_84-101 ¶¶293-351].  EIG also visited Keppel's shipyard in Brazil multiple times.  [ECF_144-2_at_102 ¶355].  No one disclosed the existence of the bribery scheme to EIG during these shipyard visits.  [ECF_144-2_at_102 ¶356].  EIG reviewed template EPC contracts that Petrobras or Sete prepared, which contained identical misrepresentations as the contracts Keppel eventually executed.  [ECF_144-2_at_98-99 ¶¶336-340; 70-71 ¶¶238-39]; *compare* [ECF_144-2_at_48-49 ¶¶148-151] *with* [ECF_151-122_at_20 §2.1, 41-42 §§6.2(b), (d), (g), (i)].  EIG's Corrigan confirmed at his deposition that "these representations and warranties" were "material to [EIG's] investment decision" because they were "an important part of the contract."  [ECF_151-128_at_19-20 (90:22-91:4); ECF_144-2_at_98 ¶338].

By investing in Sete, EIG believed it was "teaming up … with the A team of Brazil," including Petrobras and Keppel, which operated the "star"

19

shipyard in Brazil. [ECF_144-2_at_115 ¶¶390-91]. EIG approved a potential investment in Sete by Fund XIV for up to R$250,000,000 on June 27, 2011, and by Fund XV for the same amount on September 16, 2011. [ECF_144-2_at_111-12 ¶¶382-383]. In connection with each approval, EIG entered into conditional investment agreements with Sete, as a "Potential Investor." [ECF_144-2_at_119-21 ¶¶402-06]. EIG continued to conduct due diligence, as the investment was still far from final and EIG was not yet an actual investor. [ECF_144-2_at_112 ¶385, 121-122 ¶¶407-410; ECF_151-140_at 96:22-97:15, 102:24-103:13]. EIG executed an Investment Commitment Agreement with Sete on July 31, 2012 and made its first investment in Sete on August 3, 2012. [ECF_144-2_at_122-24 ¶¶412-19]. Between August 2012 and January 2015, EIG made investments in Sete totaling over $221 million. [ECF_144-2_at_126 ¶432]. EIG would not have invested in Sete had it known the truth about the bribery scheme. [ECF_144-2_at_113-15 ¶¶386-389].

## IV. AFTER EIG'S INVESTMENTS BEGAN, KEPPEL'S CONDUCT PROLONGED THE FRAUD

Even after EIG began to invest, Keppel continued to assist the fraud.

### A. The Circumstances Surrounding EIG's June 2013 Visit to Keppel's Shipyard

Keppel continued to comply with Sete's requests to allow visits to BrasFELS. For example, on January 17, 2013, Kwok reported to Tong and YY

20

Chow that Ferraz, and a "delegation of senior management" from potential lenders had visited Keppel's shipyard and received a presentation.  [ECF_144-2_at_74 ¶¶257-258].  Kwok reported they "left the yard fully satisfied with what they saw." *Id.*  In February 2013, Keppel again complied with Sete's request, permitting another senior lender to visit BrasFELS.  [ECF_144-2_at_74-75 ¶259].

At Sete's request again, in June 2013, Keppel hosted "representative[s] from Sete Brasil [i]nvestors," including EIG, and provided them with a tour and presentations concerning the progress of construction.  [ECF_144-2_at_75 ¶260].  Corrigan testified he left this visit "feeling good about the progress at Brasfels, that they were a professional company that was doing a good job." [ECF_144-2_at_75 ¶262].

### B.    Keppel Concealed the Bribery from BNDES, Prolonging the Fraud

In late 2014, Brazilian prosecutors arrested Barusco, causing the Brazilian Development Bank ("**BNDES**") to require new conditions for financing Sete, including requiring declarations from EPC contractors stating "there was no corruption."  [ECF_144-2_at_134 ¶455].  Keppel knew BNDES was Sete's largest lender and its financing was "critical" "for Sete to continue funding the [construction] payments to the shipyards."  [ECF_144-2_at_46 ¶138, 131-32 ¶447].  Jeffrey Chow approved Keppel's draft anti-corruption declarations in December 2014.  [ECF_144-2_at_79 ¶272; ECF_151-89_at_3].  The declarations

21

falsely stated that Keppel had no knowledge of and did not make corrupt payments. [ECF_144-2_at_80 ¶¶275-76; ECF_151-91_at_4-5].

On February 5, 2015, the contents of Barusco's plea agreement became public, implicating Keppel, Petrobras, and Sete in corruption relating to the Sete project. [ECF_144-2_at_80 ¶278, 140-141 ¶473; ECF_151-95_at_2-6]. BNDES refused to provide billions of dollars of critical senior financing, causing Sete to collapse and rendering EIG's investment worthless. [ECF_144-2_at_135-46 ¶¶457-490]. Sete became the centerpiece of the largest corruption scandal in Brazil's history, dubbed "Operation Car Wash," in which scores of Petrobras executives, including Duque and Barusco, were arrested and jailed. [ECF_144-2_at_132 ¶448, 136 ¶459, 140-141 ¶473]; *see generally* [ECF_155-9_at_2].

On December 22, 2017, Keppel entered into a deferred prosecution agreement with the U.S. Department of Justice (the "**DPA**"), and admitted it created consulting agreements "intended to facilitate bribe payment to obtain business from Petrobras and Sete Brasil and to conceal their purpose." [ECF_144-2_at_8 ¶5, 14-15 ¶26; ECF_151-111_at_28 ¶21]. The DPA states that in 2011, Tong, YY Chow, and Kwok authorized Skornicki to pay "one percent of the contract value as bribes" to secure contracts from Sete. [ECF_144-2_at_11-13 ¶¶17-20]. Jeffrey Chow and Skornicki pled guilty in the U.S. to their roles in facilitating and concealing Keppel's bribes. [ECF_144-2_at_18 ¶36, 20 ¶42].

## SUMMARY OF ARGUMENT

I.     The District Court erred in determining no reasonable jury could find Keppel had actual knowledge of the underlying fraud.  The District Court erroneously applied the legal standards for "knowledge" articulated by this Court in *Nomura* and *Viacom* and required EIG to prove Keppel's knowledge of "the specific communications" Petrobras/Sete made to EIG.  Those cases, however, concerned primarily liability claims arising from statutory provisions Congress intended be narrowly construed, and their analyses, thus, were not applicable here or consistent with aiding-and-abetting caselaw.  In addition to applying the wrong legal standard, the District Court's overly narrow view of this element affected its analysis of the evidence.  The District Court failed to consider all of the relevant facts and circumstances in the record and failed to draw rational inferences in EIG's favor, as it was required to do.

II.     The District Court furthered erred in holding a jury could not reasonably find Keppel substantially assisted the fraud on EIG.  The Court's analysis of substantial assistance was colored by its incorrect assumption that Keppel had no knowledge of the fraud.  Moreover, the Court disregarded key evidence when it determined (wrongly) that Keppel, Petrobras, and Sete were not engaged in a highly interdependent scheme.  Even if this Court agrees with that determination, the District Court still erred by holding that substantial assistance

23

could only be met through proof of Keppel's involvement in the fraudulent statements upon which EIG relied. The District Court's requirement blurred the line between primary and secondary liability, and ignored a long line of cases acknowledging that substantial assistance can take many forms. The District Court again failed to consider relevant evidence and draw inferences in EIG's favor, which, taken together, presented a jury issue on this element.

## STANDARD OF REVIEW

The Court reviews a district court's decision to grant summary judgment de novo and will construe the evidence in the light most favorable to the party against whom summary judgment was granted. *Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th 748, 752 (2d Cir. 2023) (per curiam). The Court must draw all inferences and ambiguities "in favor of the nonmoving party," and "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Summary judgment is inappropriate if the non-moving party has come forward with evidence that either "'make[s] it arguable' that the claim has merit," or "generates uncertainty as to the true state of any material fact." *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009) (citation omitted). It may "properly be granted ... only where there is no genuine issue of material fact to be tried." *Id.* In considering summary judgment, the district court "is not to resolve disputed

questions of fact," *id.*, since "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Moreover, the district court may not "consider the record in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence; rather it must 'review all of the evidence in the record.'" *In re Dana Corp.*, 574 F.3d at 152 (citation omitted).

## ARGUMENT

Keppel aided and abetted Petrobras and Sete's fraud on all of Sete's equity investors, including EIG. "To establish liability for aiding and abetting fraud under New York law, 'the plaintiffs must show (1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'" *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (alteration in original; citation omitted). Because Keppel did not challenge the existence of a fraud on its motion for summary judgment, [ECF_158_at_23], this appeal is limited to whether a genuine issue of material fact exists with respect to Keppel's knowledge of and substantial assistance to the fraud.

## I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO KEPPEL ON ACTUAL KNOWLEDGE

Keppel knew full well about Petrobras and Sete's fraud. In order to

establish aiding-and-abetting liability, a plaintiff must establish the aider-and-abettor had actual as opposed to constructive knowledge of the underlying wrong. *Krys*, 749 F.3d at 127. Hence, evidence "that a defendant could or should have been able to deduce the fact of an underlying fraud on the basis of red flags or warning signs" is not sufficient. *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018). "But while constructive knowledge alone cannot support a claim for aiding and abetting fraud, circumstantial evidence can be sufficient to support a finding of actual knowledge." *Id.*; *see Krys*, 749 F.3d at 127 (actual knowledge may be "discerned from the surrounding circumstances") (citing *Oster v. Kirschner*, 77 A.D.3d 51, 56 (1st Dep't 2010)). After all, "[p]articipants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a fraud." *Oster*, 77 A.D.3d at 55-56. What this means is, "once a plaintiff had actual knowledge of a specific fact, a fact-finder could reasonably infer that the plaintiff knew of the natural specific consequences of that fact." *Fed. Hous. Fin. Agency v. Nomura Holdings Am., Inc.*, 873 F.3d 85, 124 (2d Cir. 2017). Furthermore, while the defendant's knowledge must be actual, the defendant need not have "understood the full legal significance of the facts, or all the details of the primary wrongdoing." Restatement (Third) of Torts: Liability

for Economic Harm (the "**Restatement**") § 28 cmt. c (2018).[2]  "It is sufficient if the defendant was aware of facts that made the primary conduct wrongful."  *Id.*

### A.  A Reasonable Juror Could Infer Keppel's Knowledge of the Fraud From The Surrounding Circumstances

Keppel's knowledge can be inferred from the "surrounding circumstances" of the bribery and kickback scheme and from Keppel's knowledge of "specific facts."  Based on its ten-year involvement in paying kickbacks to Duque and Barusco of Petrobras, Keppel knew that when Duque and Barusco extended the scheme to Sete, Duque and Barusco would not all of a sudden decide to disclose that scheme to potential investors in Sete, including EIG.  *See* [ECF_144-2_at_8-11 ¶¶5-16; ECF_144-3_at_64 ¶¶184-85].  That is, of course, how bribery and kickback schemes operate.  They are concealed.  But, Keppel also had very specific knowledge of the fraud.  Keppel obtained three separate, detailed pitch decks from Petrobras and Sete regarding the Sete project.  *See supra* pp.10, 13-14.  Not surprisingly, none of those pitch decks disclosed even a hint that Sete was a corrupt project.  *See id.*  Keppel did not need to see every pitch deck Petrobras and Sete created for the project, nor did it need to have knowledge of the specific documents EIG reviewed in its due diligence to know that Petrobras and

---

[2] New York courts look to the Restatement of Torts in construing aider-and-abettor liability.  *See Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011); [ECF_158_at_27] (acknowledging same).

Sete would not and did not disclose the endemic corruption to Sete's investors, including EIG. Had Keppel believed that Petrobras or Sete were going to reveal the scheme to investors, Keppel itself would not have expended the effort it undertook to conceal the scheme by, among other things, creating the Consulting Agreements with shell companies controlled by Skornicki to disguise kickbacks as consulting fees, laundering its kickbacks through U.S. and foreign bank accounts and shell companies, and cautioning employees to "delete" scheme-related emails and keep such conversations "off emails". [ECF_151-111_at_28 ¶¶21-22; ECF_144-2_at_33 ¶88, 79 ¶¶273-274]; *see* ECF_144-2_at_34 ¶¶92-93, 61 ¶205.

In *Silvercreek*, the district court refused to "take from the jury" the question of whether defendant Merrill Lynch had knowledge of "Enron's overall fraud," where it could infer defendant's knowledge from similar past transactions. 346 F. Supp. 3d at 496; *see Gabriel Cap., L.P. v. NatWest Fin., Inc.*, 94 F. Supp. 2d 491, 511 (S.D.N.Y. 2000) (because defendants knew fraudsters were making misrepresentations at some road shows, court could infer defendants knew fraudsters "would make the same misrepresentations at all other road shows, including the one attended by plaintiffs"); *see also Aetna Cas. and Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 535 (6th Cir. 2000) (jury could infer knowledge from, among other evidence, duration of time defendant and fraudster knew each other and engagement in similar past dealings); *FDIC v. First Interstate Bank of*

*Des Moines, N.A.*, 885 F.2d 423, 432 (8th Cir. 1989) (affirming jury verdict where knowledge could be inferred from, among other things, defendant's past dealings with fraudster, from which it learned of prior SEC sanctions, but "potential profits in mind, recklessly chose to continue its relationship"). Keppel knew that Petrobras and Sete were defrauding Sete's investors, including EIG, by pitching the Sete investment but not disclosing the bribery and kickback scheme.

### B. The District Court Applied the Wrong Legal Standard to this Element

The District Court grappled with the fact that no Second Circuit case had "addresse[d] in detail the difference between evidence (as opposed to allegations) of constructive knowledge and evidence of actual knowledge in the context of an aiding and abetting fraud claim." [ECF_158_at_25]. It consequently turned to two Second Circuit cases that supposedly "addressed the distinction in the context of other causes of action," and applied the legal standard for knowledge set forth in *Nomura*, 873 F.3d at 122-24 and *Viacom International, Inc. v. YouTube, Inc.*, 676 F.3d 19, 30-34 (2d Cir. 2012) to the evidence in this case. [ECF_158_at_25-27]. Relying on those standards, the Court held no jury could infer Keppel's actual knowledge because there was no evidence of "Keppel's knowledge of specific communications made by Petrobras or Sete to EIG" or Keppel's "aware[ness] of a general strategy by Petrobras or Sete to conceal bribery and corruption-related risks from EIG." [ECF_158_at_29]. The District Court

29

declined to draw an inference from Keppel's knowledge "that Petrobras and Sete were raising money from investors such as EIG" because that did "not amount to actual knowledge of what Petrobras and Sete were telling or not telling EIG." [ECF_158_at_30]. The Court's analysis was severely flawed.

No New York court has required the level of knowledge that the District Court required of EIG to sustain its claim of aiding and abetting fraud. While seemingly acknowledging that "EIG d[id] not have to 'prove Keppel's knowledge of each specific misrepresentation alleged by EIG,'" [ECF_158_at_29], the District Court essentially required EIG to prove just that. The District Court repeatedly opined that evidence was lacking regarding Keppel's knowledge of "*specific* communications made by Petrobras or Sete to EIG," of "*particular* statement[s] made by Petrobras or Sete [and] communicated to EIG," and "of what Petrobras and Sete were *telling or not telling* EIG in soliciting EIG's investment." [ECF_158_at_28-30] (emphasis added). Likewise, in holding there was no evidence of Keppel's knowledge of a "general strategy by Petrobras or Sete to conceal bribery and corruption-related risks from EIG," the District Court required proof of a strategy specific to EIG. [ECF_158_at_29]. The Court noted, as an example, the lack of evidence of Petrobras or Sete "instruct[ing] or caution[ing] Keppel not to disclose the bribery scheme *to EIG* on the shipyard tours." *Id.* (emphasis added).

30

The District Court's overly narrow view of the knowledge element stemmed principally from this Court's interpretation in *Nomura* of a knowledge provision in Section 12(a)(2) of the Securities Act of 1933. [ECF_158_at_25-27] (discussing *Nomura*, 873 F.3d at 122-24). In *Nomura*, two financial institutions were found liable for violating Section 12(a)(2), which creates primary liability for selling securities through a prospectus containing misleading information. 873 F.3d at 97, 122. Unlike the claim here, Section 12(a)(2) requires the *plaintiff* to prove it did *not know* of the alleged misrepresentation when it purchased securities, i.e., the "absence-of-knowledge" element. *Id.* at 122. On appeal, defendants argued plaintiffs knew that statements concerning residential mortgage-backed securities were false because they knew of widespread practices in the mortgage industry at the time. *Id.* at 123-24. This Court rejected that argument, finding "[t]he mere availability elsewhere of truthful information [could not] excuse untruths or misleading omissions in the prospectus." *Id.* at 122 (cleaned up). It held that Section 12(a)(2) "require[d] the plaintiff to prove only that it did not know that the *specific* statement at issue" was false and, absent such knowledge, plaintiffs were "entitled to recover under Section 12." *Id.* (citing statute; emphasis in original). This Court's narrow interpretation of this statutory provision effectively broadened protection for victims of fraud in the context of a direct liability claim; that analysis is simply not applicable to the aiding-and-abetting

common law claim at issue here, particularly where it would have the reverse effect of limiting Keppel's liability.

Likewise, this Court's interpretation of a provision in the Digital Millennium Copyright Act is not applicable. *See* [ECF_158_at_27] (discussing *Viacom*, 676 F.3d at 19). The plaintiffs in *Viacom* appealed a decision by the district court, finding YouTube was entitled to safe harbor protection with respect to 79,000 video clips plaintiffs alleged violated copyright laws. 676 F.3d at 25-26. The safe harbor provision was available only to online service providers who did not have "actual knowledge" of the infringing material and, upon learning of it, acted "expeditiously to remove" it. *Id.* at 27. Plaintiffs claimed the court erred because YouTube knew generally that much of its content contained infringing material. *Id.* at 32-33. In deciding what exactly YouTube had to know to fall outside of the provision's protection, this Court acknowledged the statute's legislative history and that Congress had enacted a safe harbor specifically to "*limit*" the liability of online service providers. *Id.* at 27 (emphasis added). It then relied on the "text of the statute" to limit the liability of online service providers to those who had knowledge of "specific and identifiable instances of infringement" only. *Id.* at 30, 32. As this Court reasoned, the statute's requirement that online providers expeditiously remove infringing material was "possible only if the service provider kn[ew] with particularity which items to remove." *Id.* at 30.

32

The knowledge element in aiding-and-abetting claims is not subject to the same specificity that is required by the statutes in *Viacom* and *Nomura*, which were intended by Congress to be narrowly construed. "[A]iding and abetting does not require the defendant to have known 'all particulars of the primary actor's plan,'" *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 495 (2023) (citation omitted), let alone the "specific communications" giving rise to fraudulent omissions, as the District Court required EIG to prove, [ECF_158_at_28-30]. All that is necessary is the aider-and-abettor's "aware[ness] of [the] facts that made the primary conduct wrongful." Restatement § 28 cmt. c.

Indeed, plaintiffs have successfully defeated summary judgment motions with evidence of knowledge that was far less specific than what the District Court demanded here. For example, in *Primavera Familienstifung v. Askin*, the district court denied defendant brokers' motion for summary judgment on an aiding and abetting fraud claim despite acknowledging "the evidence [did] not reveal a great amount of detail as to the Brokers' knowledge regarding [the fraudster's] representations of market neutrality." 130 F. Supp. 2d 450, 509-10 (S.D.N.Y. 2001). The fund manager had falsely promised investors stable returns, using a market-neutral strategy. *Id.* at 463. The defendants' knowledge that market neutrality was a constraint, combined with defendants' involvement in revising valuation marks, supported the inference that defendants knew

33

misrepresentations had been made to investors concerning market neutrality. *Id.* at 509-10. Moreover, in *Cupersmith v. Piaker & Lyons P.C.*, the court denied in part defendants' motion for summary judgment on aiding and abetting fraud, where defendants were accountants for entities perpetuating a Ponzi scheme through misrepresentations to investors about potential returns. 2016 WL 5394712, at *1 (N.D.N.Y. Sept. 27, 2016), *aff'd sub nom. Ayers v. Piaker & Lyons, P.C.*, 748 F. App'x 368 (2d Cir. 2018). The Court inferred from the defendants' familiarity with the "improper nature of" the transactions at issue that it had knowledge of the fraud. *Id.* at *14. Neither case required proof of the aider-and-abettor's knowledge of the "specific communication" that gave rise to the fraud, for that is not what the law requires.[3]

Here, evidence from which a rational juror could infer that Keppel knew Petrobras and Sete were misleading investors, including EIG, by concealing the existence of the bribery scheme is all that was necessary to meet the knowledge element. That this level of awareness would be sufficient makes perfect sense because – unlike the absence-of-knowledge element or safe harbor provision in copyright law – the purpose of the knowledge element in aiding-and-abetting liability is intended to separate the "truly culpable" aider from the "innocent

---

[3] Nor do the aiding-and-abetting cases the District Court cited articulate such a requirement. *See* [ECF_158_at_27-28] (citing cases); *infra* pp.40-41 (distinguishing cases).

bystander." *Twitter*, 598 U.S. at 488-89. New York courts, therefore, have frowned upon attempts by defendants to "draw[] distinctions based on gradations of knowledge" where it would lead the court to "endorse what is essentially a 'see no evil, hear no evil' approach." *Oster*, 77 A.D.3d at 57.[4] The Appellate Division in *Oster* reversed a trial court's decision to dismiss an aiding and abetting fraud claim brought against attorneys and a law firm that drafted private placement memoranda soliciting investments in a Ponzi scheme, where the defendants knew of certain misrepresentations in documents, but had no knowledge of the Ponzi scheme. *Id.* at 56-57. Either form of knowledge was sufficient to bring the defendants within the sphere of "truly culpable." Likewise, any distinction Keppel attempts to draw between its knowledge of Petrobras and Sete's concealment of the bribery scheme from potential investors, including EIG, and its knowledge of the "specific communications" Petrobras and Sete made to EIG is arbitrary and meaningless. Either gradation of knowledge is sufficient to show Keppel was culpable.

Numerous circuit courts applying the same standard as New York and the Restatement have rejected a narrow view of the knowledge element. For example, in *Aetna*, the Sixth Circuit affirmed a jury's verdict finding a bank and

---

[4] The Appellate Division further expressed disagreement with taking "a narrow view of the 'actual knowledge' requirement under New York law." 77 A.D.3d at 58 n.1.

banker liable for aiding and abetting the fraud of a company that manipulated its financial position to obtain a bond. 219 F.3d at 534-37. The defendants did not know the specific representations the primary fraudster made to the plaintiff, did not themselves make representations, and "did not have a full understanding of the bonding business." *Id.* at 527, 535-36. Nonetheless, the circumstances under which the aider-and-abettors provided a loan to the primary wrongdoer sufficiently raised an inference of defendants' "general awareness of [their] role in the other's tortious conduct." *Id.* at 534. The Sixth Circuit rejected the defendants' attempt to define the scope of the fraud "too narrowly," as defendants did not need to "know all of the details of the primary party's scheme for liability to attach." *Id.* at 535, 536. The Eighth Circuit, too, in *FDIC*, affirmed a jury's finding of liability on aiding and abetting fraud and upheld a jury instruction requiring plaintiff to prove the defendant's "general awareness of its overall role in [the fraudster's] scheme." 885 F.2d at 431. The Eighth Circuit rejected defendant's claim that more than "general awareness" was necessary, calling defendant's argument an attempt to "dissect 'knowledge' too thinly." *Id.* So, too, the Third and D.C. Circuits. *See Monsen v. Consol. Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir. 1978) (reinstating jury's finding of liability on aiding and abetting securities fraud because defendant's "general awareness" of its role in overall wrongdoing sufficiently established its knowledge); *Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir.

36

1983) (affirming judgment where aider-and-abettor had "general awareness of her role in a continuing criminal enterprise").

Importantly, the District Court's overly restrictive view of the knowledge element colored its analysis of the evidence, as it held it could not infer Keppel's knowledge of the "specific communications" Petrobras and Sete made to EIG. [ECF_158_at_28-30]. The evidence does, however, support the inference that Keppel knew Petrobras and Sete were misleading investors, including EIG, by concealing the existence of the bribery scheme. The District Court acknowledged there was evidence that Keppel knew "(1) EIG was an investor in Sete; (2) Petrobras and Sete were perpetrating a bribery scheme; and (3) some Petrobras/Sete investor materials – which Keppel received as a potential investor in Sete – did not disclose the bribery scheme." [ECF_158_at_28]. And, Keppel conceded on summary judgment that there was evidence Keppel knew "Petrobras was seeking capital to finance Sete." Dkt. No. 149-1 at 33-34; *see* Dkt. No. 149-3 at 15 (Keppel conceding same on reply). Once Keppel's knowledge of these specific facts was established, "a fact-finder could reasonably infer that [Keppel] knew of the natural specific consequences of th[ese] fact[s]." *Nomura*, 873 F.3d at 124.

The natural consequence of Keppel's knowledge that Petrobras and Sete were soliciting investors, including EIG, in a project embroiled with

corruption, where promotional materials failed to reveal that corruption, is precisely Keppel's knowledge of the underlying fraud. *See Accent Delight Int'l Ltd. v. Sotheby's*, 2023 WL 2307179, at *20 (S.D.N.Y. Mar. 1, 2023) ("courts have found a sufficiently strong inference of actual knowledge based on evidence that a defendant reviewed documents or otherwise had access to information that would have revealed or indicated the fraud"); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 2016 WL 5719749, at *5 (S.D.N.Y. Sep. 29, 2016) (aider-and-abettors' awareness of omissions and misleading statements in "marketing materials" created sufficient inference of actual knowledge of fraud); *Cupersmith*, 2016 WL 5394712, at *14 (accounting firm's familiarity with "improper nature of" transactions raised genuine issue of fact regarding actual knowledge of fraudulent Ponzi scheme); *Askin*, 130 F. Supp. 2d at 509 (defendants' knowledge that funds were marketed as "market-neutral," and defendants' involvement in revising prices supported inference of defendants' knowledge that fraudster made misrepresentation). The evidence presented what should have been a jury issue.

## C. The District Court Failed to Consider Keppel's Extraordinary Economic Motive

Finally, while the District Court disregarded evidence of Keppel's extraordinary economic motive as legally irrelevant, [ECF_158_at_30], that Keppel had a unique motive is a factor a jury could consider, alongside other factors, to determine whether collectively the evidence supports an inference of

knowledge. For example, in *Silvercreek*, the district court denied defendant Merrill Lynch's summary judgment motion because defendant's "'clear opportunity and a strong financial motive' provide[d] a further legally sufficient basis for inferring its actual knowledge of the fraudulent purpose behind" its transactions. 346 F. Supp. 3d at 497 (citing *Wight v. BankAmerica Corp.*, 219 F.3d 79, 92 (2d Cir. 2000)). And, this Court in *Wight*, held that plaintiff's allegations of "a clear opportunity and a strong financial motive to aid the [] fraud" were "more than suffic[ient] to plead the requisite knowledge" element.[5] 219 F.3d at 92; *see also Bullen v. CohnReznick, LLP*, 194 A.D.3d 637, 638 (1st Dep't 2021) (actual knowledge pled based on defendant's "access to the fund's financial information, as well as defendant's 'strong financial motive' to aid the fund manager") (citation omitted).

Here, the circumstances surrounding Keppel's knowledge of (i) EIG through shipyard visits, (ii) Sete's fundraising needs, and (iii) Sete and Petrobras's fraudulent marketing materials, collectively give rise to an inference of knowledge that is only strengthened by the fact that the foregoing knowledge was held by the same individuals with knowledge of the bribery scheme and a motive to conceal it. *See supra* pp.9-19, 20-21; [ECF_151-120_at_3-4]. Keppel secured contracts worth

---

[5] The District Court distinguished *Wight* as occurring at the pleading stage, ([ECF_158_at_30]), but nothing in *Wight* suggests evidence of motive is legally irrelevant on summary judgment.

nearly $5 billion through Sete. *Supra* p. 15, 17. These circumstances and facts differ markedly from the aiding-and-abetting cases the District Court cited in analyzing this element, in which defendants' summary judgment motions were granted. *See* [ECF_158_at_27-28]. In *de Abreu v. Bank of America Corp.*, an entity perpetrated a Ponzi scheme using defendant correspondent banks. 812 F. Supp. 2d 316, 320 (S.D.N.Y. 2011). The only credible evidence of the banks' knowledge of the Ponzi scheme was the presence of "black market currency trader[]" transactions, which plaintiffs' expert admitted were not "per se improper." *Id*. at 323-25. The court opined, in dicta, even if the banks had believed the transactions were "per se improper," indicating money laundering, that would amount to knowledge of money laundering only and not of the Ponzi scheme. *Id*. at 325-26. The court's hypothetical would be analogous to this case if the only evidence indicating Keppel's knowledge of the fraud was that Keppel knew bribes were being paid on Sete's contracts. But here, unlike in *Abreu*, additional facts exist, including that Keppel participated in and concealed the bribery, and knew of EIG and received fraudulent marketing materials. *See supra* pp.9-19, 20-21. *Chemtex, LLC v. St. Anthony Enterprises, Inc.*, 490 F. Supp. 2d 536 (S.D.N.Y. 2007), too, is not analogous. There, the plaintiff failed to offer evidence in support of *any* element of an aiding and abetting fraudulent conveyance claim, including that a conveyance occurred. *Id.* at 546-48. Unlike

40

here, where Keppel's senior executives directed others to "find out" about the identities of Sete's investors and facilitated shipyard visits for potential and actual investors, including EIG, [ECF_144-2_at_25 ¶¶56-57, 52 ¶162, 102 ¶355], the alleged aider-and-abettor in *Chemtex* "was utterly unaware of [plaintiff's] existence." 490 F. Supp. 2d at 545. *Global Mins. & Metals Corp. v. Holme*, 35 A.D.3d 93 (1st Dep't 2006), too, is inapposite. The court dismissed an aiding and abetting breach of fiduciary duty claim, where no evidence existed that the aider – the fiduciary's wife – knew any facts giving rise to the duty or breach. *Id.* at 102.[6]

The issue of Keppel's knowledge of Petrobras and Sete's fraud should go to the jury.

## II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO KEPPEL ON SUBSTANTIAL ASSISTANCE

The substantial assistance element is met "where a defendant 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed.'" *Silvercreek*, 346 F. Supp. 3d at 487 (citation omitted). The inquiry is case-specific and substantial assistance "'can take many forms,' such as '[e]xecuting transactions' or helping [] to present an 'enhanced

---

[6] Nor is the illustration the District Court relied on from the Restatement analogous, as that example concerned whether a bank knew and substantially assisted wrongdoing where "red flag[s]" existed only. [ECF_158_at_27] (quoting Restatement § 28 cmt. d, illus. 5). Unlike there, Keppel perpetrated and itself concealed the very wrongdoing concealed from Sete's investors.

financial picture to others.'" *Id.* (citation omitted). "Executing transactions, even ordinary course transactions, can constitute substantial assistance under some circumstances, such as where there is an extraordinary economic motivation to aid in the fraud." *Askin*, 130 F. Supp. 2d at 511. Moreover, while a defendant's failure to speak or act would ordinarily not amount to substantial assistance absent a legal duty, "[s]ubstantial assistance may [] be found when the defendant remained silent or inactive in an effort to mislead another and facilitate the primary wrong." Restatement § 28 cmt. d. Further, "[w]hether the assistance is substantial or not is measured, in turn, by whether 'the action of the aider and abettor proximately caused the harm on which the primary liability is predicated.'" *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005) (citation omitted). The substantial assistance inquiry, like actual knowledge, "must be considered in view of all the circumstances." Restatement § 28 cmt. d.

Here, the District Court's conclusion that no reasonable juror could find Keppel substantially assisted the fraud stemmed principally from its belief that EIG had to prove Keppel's "involvement in the making of the fraudulent misstatements." [ECF_158_at_37]. Absent that proof, the Court required evidence of a highly interdependent scheme or a legal duty requiring Keppel to tell the truth. [ECF_158_at_33-38]. The District Court analyzed the evidence through that framework to find (i) the bribery scheme was attenuated from the fraud, such

42

that an exception could not be made to the "usual rule," [ECF_158_at_34-37]; (ii) the shipyard visits concerned non-disclosure acts only but Keppel had no duty to speak, [ECF_158_at_37-38]; (iii) Keppel's acts of concealment lacked a "nexus" with the fraud or were legally irrelevant because they occurred after EIG's last investment, [ECF_158_at_33, 38-39]; and (iv) there was no evidence Keppel was involved in drafting the specific fraudulent statements EIG relied on, [ECF_158_at_33-34, 39]. Here, too, the District Court improperly construed the law and facts, warranting a reversal.

### A. The District Court Erred in Finding the Bribery and Its Concealment Were Attenuated

A threshold issue the District Court considered was whether the fraud concerned a highly interdependent scheme. Courts in New York have held that in cases concerning "a highly interdependent scheme in which both parties benefitted from [the] fraudulent activity … allegations that a defendant actively assisted and facilitated the fraudulent scheme itself, as opposed to assisting in the preparation of the documents themselves, are sufficient." *ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308, 1328 (S.D.N.Y. 1997); *Nathel v. Siegal*, 592 F. Supp. 2d 452, 470 (S.D.N.Y. 2008). The same standard has been used at the summary judgment stage as well. *Askin*, 130 F. Supp. 2d at 512 (denying defendant's summary judgment motion where evidence existed of defendant's participation in "symbiotic" fraud scheme). The District Court relied on this standard at the

43

pleading stage to uphold EIG's aiding-and-abetting fraud claim. [ECF_45_at_21]. EIG's allegations of Keppel's substantial assistance – i.e., "(1) facilitating EIG's due diligence through the two tours of the Keppel Shipyard; and (2) concealing the bribery and kickback scheme from EIG by laundering the bribes through shell companies" – were sufficient because this case involved a highly interdependent scheme. *Id.* Notwithstanding the fact that discovery confirmed the truth of those allegations and revealed additional acts (e.g., more shipyard visits), the District Court on summary judgment held that Keppel's same conduct could not amount to substantial assistance because no proof supposedly existed of a highly interdependent scheme. [ECF_158_at_34-37].

The interdependent nature of the scheme here was just as strong, if not stronger, than in *Nathel* and *ABF/Askin*. In *Nathel*, plaintiffs alleged they were fraudulently induced to invest in oil and gas partnerships and that two managers of the partnerships aided and abetted the fraud by holding themselves out as oil and gas experts (which they were not) to "make the partnerships appear legitimate." 592 F. Supp. 2d at 459, 469-70. The defendants had no "direct dealings" with the plaintiffs, unlike here, and were not involved in soliciting their investment. *Id.* at 470. Yet, the District Court held that the aider-and-abettors' "assistance (signing the partnership agreements as managing partners) and their concealment (not disclosing that they … lack[ed] oil industry expertise)" substantially assisted this

highly interdependent scheme. *Id*. Similarly, in *ABF*, the plaintiffs alleged they were fraudulently induced by their investment advisor to invest in high-risk securities. 957 F. Supp. at 1315-16. The district court held that certain defendant brokers allegedly assisted this "symbiotic fraudulent scheme" by inflating performance marks that were "ultimate[ly] disseminat[ed]" to investors, and selling the high-risk securities to the investment advisor. *Id*. at 1330. Because the brokers, like Keppel, had "extraordinary economic motivation" to aid the fraud, having "made millions of dollars as a result of their dealings with" the investment advisor, plaintiffs' allegations that the brokers "executed 'ordinary course trades' and remained silent about [the fraudsters]'s misrepresentations" were sufficient acts of substantial assistance. *Id*. at 1316, 1330. On summary judgment, the evidence substantiated the allegations, raising an issue for trial. *Askin*, 130 F. Supp. 2d at 507-13.

Here, too, the bribery scheme at Sete and its fraudulent concealment from Sete's investors concerned one highly interdependent scheme, in which EIG's investment directly financed the bribes. Sete used the money it fraudulently obtained from EIG and other investors to pay Keppel for the construction of the rigs. *See* [ECF_151-52_at_2] (Keppel acknowledging Sete's fundraising was "to fund the construction of 21 drilling rigs for Petrobras"); [ECF_144-2_at_53 ¶ 165]. As Keppel admits, once "Keppel received milestone payments from Sete for the

construction of its drillships," Keppel kicked back a percentage of that money as "commission payments to Zwi Skornicki's companies." [ECF_144-3_at_68 ¶195]. Skornicki then used a portion of his so-called "commission" payment to effectuate bribes to Petrobras/Sete executives, on Keppel's behalf. [ECF_144-2_at_74 ¶256].

The sequence of events that occurred in the summer of 2012 illustrates the direct link between the investors' money and the bribe payments:

- On July 31, 2012, EIG executed the Investment Commitment Agreement and became an investor in Sete. [ECF_144-2_at_122-23 ¶412].

- With EIG's commitment secured, on August 2, 2012, Keppel and Sete executed five additional EPC contracts. [ECF_144-2_at_70 ¶238].

- On August 3 and August 9, 2012, EIG funded its first capital contributions to Sete of $75 million. [ECF_144-2_at_124 ¶¶419-20].

- On August 7, 2012, Keppel used its subsidiary Fernvale to execute the Consulting Agreements with Skornicki's shell companies in order to effectuate and conceal the forthcoming bribe payments. [ECF_144-2_at_48 ¶¶145-46, 62 ¶¶209-11, 63 ¶213, 64 ¶¶217-19].

- Upon receiving EIG's funds, between August 28 and 30, 2012, Sete paid over $65 million to Keppel's subsidiary Fernvale. [ECF_144-3_at_76-77 ¶510].

- On August 30, 2012, Fernvale kicked back 1.5% of the revenue from Sete to Skornicki's company with the understanding that Skornicki would deposit a portion of that "fee" into the bank accounts of the bribe recipients. [ECF_144-2_at_63 ¶214, 72 ¶243, 73 ¶254, 74 ¶256].

Indeed, in a related case currently before the U.S. District Court for the District of Columbia concerning the underlying fraud by Petrobras, the Court held, "[t]here

[wa]s no dispute of fact … [that] 'money invested in Sete was used to pay bribes and kickbacks.'" *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*, 621 F. Supp. 3d 30, 53 (D.D.C. 2022), *aff'd*, 104 F.4th 287 (D.C. Cir. 2024) (citation omitted).  That Court determined on summary judgment that "[i]nvestors contributed capital to Sete, Sete used that capital to pay shipyards, the shipyards kicked back a percentage of the contract payments, and those kicked-backed sums were divided among executives of Petrobras, Sete, and the Workers' Party." *Id.* at 53.[7]  That finding is entirely consistent with the evidence in this case.

Notwithstanding the foregoing evidence, the District Court held the bribery was "attenuated" from the fraud because no evidence existed "that investor money – much less EIG's investment in particular – was necessary to finance the bribes." [ECF_158_at_37].  That determination was plainly wrong.  *Supra* pp.45-47.  The District Court further opined that a symbiotic scheme did not exist because the "bribery scheme, although criminal, was not inherently fraudulent." [ECF_158_at_36].  But, it was.  The bribery scheme was entirely dependent on Sete and Petrobras's ability to successfully and fraudulently procure financing from investors like EIG, because that money funded the bribes.  *Supra* pp.45-47.

---

[7] EIG provided a copy of this decision to the District Court on August 10, 2022. Dkt. No. 132.

And, the disclosure of the bribery scheme to investors would have destroyed the bribery scheme and subjected Keppel and others to criminal prosecution.

The District Court's belief that the fraud on EIG "was not dependent on the bribery scheme," too, was incorrect. [ECF_158_at_36-37]. The fraud existed solely to conceal the bribery scheme. Keppel relied upon Petrobras and Sete to attract investors to fund the contracts and bribes while keeping the bribery a secret, and Petrobras and Sete, in turn, relied on Keppel to pay the bribes and to facilitate their fundraising efforts, while also keeping the bribery a secret.

Finally, the District Court's claim that *ABF, Askin*, and *Nathel* concerned businesses that were "entirely fraudulent," whereas Petrobras/Sete and Keppel were engaged in a "real project" – even if true[8] – is not legally relevant. [ECF_158_at_36]. The relevant inquiry in each of those cases was not what the nature of the business was, but rather, what the nature of the fraudulent scheme was, such that the aider benefitted from the scheme as well. That Sete concerned a "real project" does not undermine the criminality of Keppel's conduct. Because the evidence creates a genuine issue of fact regarding the existence of a highly interdependent scheme, the District Court's decision should be reversed.

---

[8] *ABF/Askin* involved real funds and real securities purchased pursuant to a misleading investment strategy. *Askin*, 130 F. Supp. 2d at 463; *ABF*, 957 F. Supp. at 1314-15.

**B.    The District Court Improperly Confined This Element to Acts Concerning the Preparation of Fraudulent Statements Only**

Even if this Court finds no evidence existed of a highly interdependent scheme (which there was), it should reverse the District Court's decision to strictly confine the substantial assistance element to acts involving the preparation of fraudulent documents only.  Upon finding that a highly interdependent scheme did not exist, the District Court held EIG must "satisfy[] the usual rule that aiding and abetting fraud requires proof of involvement in the making of the fraudulent misstatements."  [ECF_158_at_37].  The District Court then analyzed Keppel's conduct through the framework of that principle alone.  It construed Keppel's involvement in the shipyard visits not as affirmative assistance or concealment, but as acts of nondisclosure only.  [ECF_158_at_37-38].  And, in analyzing whether Keppel helped conceal the fraud, the Court limited its analysis essentially to whether EIG had relied on any specific misrepresentations Keppel made in the Consulting Agreements, EPC contracts, and anti-corruption declarations.  [ECF_158_at_33-34, 38-39].  The Court's application of this so-called rule was overly rigid.

The "rule" requiring an aider-and-abettor's involvement in the preparation of misstatements does not fit the facts of this case.  The principle appears to have originated from *Terrydale Liquidating Trust v. Gramlich*, which involved a securities fraud claim based on the "inclusion of misinformation in a

49

press release" only and led the court to require "substantial assistance [] relate[d] to the press release." 549 F. Supp. 529, 531 (S.D.N.Y. 1982). But here, Petrobras and Sete made fraudulent omissions to EIG, not just in select documents, but in person, emails, and meetings throughout an extended time period. *See* [ECF_17_at_20-21 ¶¶64-69]. For example, EIG alleged fraudulent omissions occurred (i) through emails EIG received regarding Sete; and (ii) at meetings/conferences EIG attended with Ferraz. *Id*.

The law of substantial assistance, moreover, is not intended to be inflexible. This is apparent from the cases acknowledging different forms of substantial assistance where "highly interdependent" schemes exist, as well as cases – in the investment fraud context, no less – explaining that assistance can take many forms. *See, e.g., Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2d Cir. 1978) (affirming aiding-and-abetting liability, and listing examples of what "substantial assistance might include," only one of which is "aiding in the[] preparation" of fraudulent documents), *opinion amended*, 1978 WL 4098 (2d Cir. May 22, 1978); *Silvercreek*, 346 F. Supp. 3d at 487 (denying defendants' motion for summary judgment where substantial assistance of investment fraud took "many forms"). The Restatement, too, urges a flexible approach, stating that evidence of one element may "color[] the interpretation of the other," such that "a clear understanding of wrongdoing can make a small act of assistance more

blameworthy." Restatement § 28 cmt. d; *see Twitter*, 598 U.S. at 497 (aiding-and-abetting liability "should not be taken as inflexible codes"). Hence, even in the absence of a highly interdependent scheme, a rational fact-finder could find that Keppel's conduct formed a basis for aider-and-abettor liability.

Indeed, numerous investment fraud cases permit a finding of substantial assistance based on the aider-and-abettor's conduct relating to the fraud, even if it did not involve the preparation of fraudulent documents (or a finding of a highly interdependent scheme). In *Gabriel Capital*, the district court refused to dismiss an aiding and abetting fraud claim, where plaintiffs purchased securities in a company constructing mini-mills that turned out to have operational problems inconsistent with representations in offering documents. 94 F. Supp. 2d at 495-98. Plaintiffs sufficiently alleged that the defendant, a mini-mill operator serving as a technical advisor, substantially assisted the fraud even though it did not "participate[] in the drafting of [offering documents]" and did not attend the road show plaintiffs attended. *Id.* at 511-12. The defendant's presence as a partner to the company, given its experience in the industry, like Keppel, "played a substantial role" in inducing plaintiffs to invest. *Id.* at 512.

Likewise, in *In re Par Pharmaceutical, Inc. Securities Litigation*, plaintiffs alleged that Par Pharmaceutical fraudulently concealed the fact that Par and its subsidiary, Quad Pharmaceutical, paid bribes to expedite drug approvals.

51

733 F. Supp. 668, 672 (S.D.N.Y. 1990). The plaintiffs claimed defendants Quad and Quad's CEO substantially assisted Par's fraud, but defendants – like Keppel – claimed they only paid bribes and neither intended to assist the fraud nor assisted in the preparation of misleading statements. *Id.* at 672-73, 680-81. The court held the defendants were "more than mere bystanders" to the fraud, and a "fair inference" could be made that defendants' "failure to disclose was designed intentionally to aid the securities fraud, since the securities fraud provided [defendants] with protection from disclosure of the bribery by the other defendants." *Id.* at 682.

Keppel, too, seeks to escape liability on the technical basis that, because it was not involved in preparing the specific fraudulent omissions EIG relied on, it was a "mere bystander[]" to the fraud. Not so.

### 1. Keppel Affirmatively Assisted and Helped Conceal the Fraud Through the Shipyard Visits

A reasonable juror could conclude Keppel substantially assisted the fraud by facilitating the shipyard visits because that conduct lent credibility to the Sete project, assisted the due diligence efforts of Sete's potential/actual investors, and helped maintain the secrecy of the bribery scheme. The District Court failed to consider the circumstances surrounding EIG's visits to the shipyard and the fact that the individuals at Petrobras, Sete and Keppel who authorized and controlled these shipyard visits had knowledge of the bribery and a motive to conceal it. *See*

*supra* pp.7-16; [ECF_158_at_37-38; ECF_151-120_at_3-4]. *See also Askin*, 130 F. Supp. 2d at 512 (evidence of extraordinary motivations took "transactions out of the realm of 'routine' sales"); *Silvercreek*, 346 F. Supp. 3d at 492 (same).

The visits to BrasFELS by EIG, which were authorized by Keppel, affirmatively assisted Petrobras and Sete's fraudulent scheme. An aider-and-abettor may substantially assist a fraud by helping present an enhanced picture to others. *Silvercreek*, 346 F. Supp. 3d at 487. In *Gabriel Capital*, the aider-and-abettor played no role in drafting fraudulent materials but nonetheless was found to have "played a substantial role in inducing plaintiffs and other investors" to invest by lending credibility to the investment. 94 F. Supp. 2d at 512. And, in *Sotheby's*, plaintiffs alleged that Sotheby's substantially assisted the fraud of an art broker who resold artwork for millions more than what he paid. 2023 WL 2307179, at *1. The district court denied summary judgment to Sotheby's on aiding and abetting fraud with respect to the sale of an artwork by the artist Gustav Klimt where Sotheby's "coordinated a viewing of the Klimt and saw [the plaintiff] at that viewing." *Id.* at *24. The plaintiff testified that seeing the Sotheby's employee at the viewing "helped convince" him the fraudster's "recommended price [was] legitimate." *Id.* This evidence supported an inference of substantial assistance since Sotheby's presence and coordination of the viewing "were critical to [the broker's] ability to convince Plaintiffs to purchase the Klimt." *Id.*; *see Bankers*

53

*Conseco Life Ins. Co. v. KPMG LLP*, 189 A.D.3d 402, 402-03 (1st Dep't 2020) (reversing dismissal of aiding and abetting fraud claim where substantial assistance allegedly "enabled the fraud to proceed" and "plaintiffs would not have entered into transactions with [fraudulent entity] if defendant had not lent it credibility").

Here, too, Keppel's shipyard visits played a substantial role in assisting the due diligence efforts of Sete's potential investors, including EIG, and lending credibility to an investment in Sete. The shipyard visits lasted hours and included a tour of the entire shipyard and a presentation by Keppel, touting the shipyard's capabilities with a question-and-answer session. [ECF_144-2_at_35-36 ¶¶100-102, 54-55 ¶¶172-174, 75 ¶260]; *see supra* p.16 (Hayden describing second visit); [ECF_151-128_at_40 (166:8-13)] (Corrigan confirming each visit was "very similar"). Sete believed the "expected" result of the visits would be a "reduction in the risk perception of the project" by its potential investors. [ECF_144-2_at_37 ¶104; ECF_151-27_at_3]. Sete knew it "could 'count on [Keppel's] usual assistance'" in permitting potential investors conducting due diligence visit Keppel's shipyard. [ECF_144-2_at_53 ¶¶166-67 (citing ECF_151-54_at_3)]. Specifically, the "August 2011 and March 2012 shipyard tours were part of EIG's due diligence in connection with its Sete investment." [ECF_158_at_37]. Indeed, Corrigan testified EIG was "comfortable" with Keppel and considered Keppel "the star [shipyard] because it had a long history of operating in Brazil." [ECF_151-

128_at_ 110:12-16, 129:23-25; ECF_144-2_at_115 ¶391]. EIG's Hayden, too, was "quite fascinated" by the visit, and received "comfort that these ships could be built in Brazil." [ECF_151-130_at_11 (84:10-20), 13 (86:6-7); ECF_144-2_at_55 ¶174]. Keppel continued to host Sete's investors and lenders at its shipyard, even after EIG's investments began. [ECF_144-2_at_74-75 ¶¶259-60]. For example, in June 2013, Keppel hosted all of Sete's investors at its shipyard, including EIG, providing a tour and presentation. [ECF_144-2_at_75 ¶260]. Corrigan testified he left the visit "feeling good about the progress at Brasfels" and "that they were a professional company." [ECF_144-2_at_75-76 ¶262]. Where Sete's core business involved the drilling rigs, the opportunity to tour the site on which the rigs would be built "played a substantial role in inducing [EIG] and other investors" to invest. *Gabriel Capital*, 94 F. Supp. 2d at 512. The District Court's characterization of these visits as "inaction" missed the point: the visits legitimatized the corrupt Sete project and facilitated the due diligence efforts of Sete's investors, including EIG.

In any event, the District Court failed to consider the evidence indicating that Keppel's silence during the shipyard tours was intentionally designed to aid the fraud. "[E]ven in the absence of a duty to act or disclose information, inaction on the alleged aider and abettor's part can provide a basis for liability where the inaction was 'designed intentionally to aid the primary fraud.'" *ABF*, 957 F. Supp. at 1328. As established above, Keppel needed the

55

bribery scheme to remain hidden to avoid criminal penalties and to secure contracts worth billions of dollars from Sete. *Supra* pp.45-47. In other words, Keppel needed Petrobras and Sete to succeed in fraudulently concealing the bribery and inducing EIG's investment, just as much as Petrobras and Sete did. A jury could fairly infer that Keppel's facilitation of the due diligence efforts of Sete's investors without revealing the bribery scheme – despite knowing Sete was corrupt – amounted to substantial assistance. *See Cupersmith*, 2016 WL 5394712, at *16 (accountants with no professional relationship with plaintiffs provided substantial assistance by failing to notify plaintiffs of fraud and issuing clean audit reports, allowing fraud "to continue"); *Monsen*, 579 F.2d at 803 (district court "did not consider the critical fact" that the bank substantially assisted by insisting upon note program, despite knowing fraudster company would not reveal certain information about it to plaintiff noteholders).

Construing the evidence in EIG's favor, a genuine issue of fact existed as to whether Keppel substantially assisted the fraud through the shipyard visits.

### 2. Keppel's Sham Consulting Agreements and Concealment of Bribes Furthered the Fraud

Keppel further enabled the fraud by helping to conceal the bribery scheme through the Consulting Agreements and money laundering. *Supra* pp.13, 17-19, 22. In *Eastman Kodak Co. v. Camarata*, the district court held that an aider-and-abettor's acts of concealment, which included money laundering and

56

payment of kickbacks, "further[ed]" the fraud and "allowed it to continue for longer than it otherwise would have."  2006 WL 3538944, at *11, 13 (W.D.N.Y. Dec. 6, 2006).  The court upheld the claim even though no allegations existed of the aider-and-abettor making any misrepresentations.  Likewise, in *Cupersmith*, the district court denied defendants' motion for summary judgment, where the issuance of clean audit reports by an accounting firm "helped conceal the true nature of the Ponzi scheme and thereby allowed it to continue," even though the plaintiffs "never received or relied on any of Defendants' work product in making their investments."  2016 WL 5394712, at *16.  Similarly, Keppel's creation of sham Consulting Agreements and shell companies with Skornicki to disguise the money from Sete (and its investors) to Petrobras/Sete executives as "consulting fees" allowed the fraud to continue.  [ECF_144-2_at_14-15 ¶¶26-28, 62-63 ¶¶210-216].

The District Court believed Keppel's admissions of concealment were, as a matter of law, insufficient because there was no evidence Keppel intended "to conceal the bribery scheme from Sete investors."  [ECF_158_at_39]. But, this conclusion simply assumed that Keppel did not know about the underlying fraud.  As explained above, a reasonable juror could find Keppel

57

possessed the requisite knowledge.  *Supra* pp.25-41.[9]

Taking the facts in EIG's favor, a genuine issue of fact exists regarding whether Keppel substantially assisted the fraud by concealing the bribery scheme and allowing the fraud to continue undetected.

### 3.    Keppel Executed EPC Contracts Incorporating Misrepresentations from Petrobras/Sete

Keppel also furthered the fraud by executing EPC contracts that incorporated misrepresentations from Petrobras and Sete.  There is no dispute that EIG, while conducting due diligence, reviewed and relied on draft EPC contracts from Petrobras/Sete that represented, among other false statements, that EPC contractors were "not in violation of any Applicable Law."  [ECF_144-2_at_98-99 ¶¶336-40].  EIG considered "these representations and warranties … material to its investment decision."  [ECF_144-2_at_98 ¶338].  Keppel reviewed and commented on the draft EPC contracts.  [ECF_144-2_at_50 ¶153; ECF_151-127_at_16-18 (75:3-77:4)].  Keppel then executed six EPC contracts containing the

---

[9] Likewise, the District Court's belief that Keppel's execution of fraudulent EPC contracts and anti-corruption declarations lacked a "substantial[] link[]" to the fraud was incorrect for the same reason, [ECF_158_at_39]: the Court wrongly assumed Keppel performed these actions without knowledge of the underlying fraud.  The District Court's error regarding Keppel's knowledge alone requires reversal, as that conclusion colored its analysis of this element.

same representations EIG had relied on, despite knowing the provisions were false. *Supra* p.19 (comparing draft and final contract provisions); [ECF_158_at_18].

The District Court believed Keppel's conduct was inactionable as a matter of law because EIG relied on the draft EPC contract, not the specific EPC contracts Keppel executed. [ECF_158_at_33]. The District Court's legal analysis improperly blurred the divide between conduct giving rise to fraud, which requires plaintiff's reliance on defendant's misstatements, and aiding-and-abetting conduct, which does not. *See Abu Dhabi Com. Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 450-51 (S.D.N.Y. 2012) (denying defendant Morgan Stanley's summary judgment motion on aiding and abetting fraud but granting motion on fraud since "a defendant who made no actionable misstatement … can be liable for aiding and abetting fraud, but not fraud"). What matters for purposes of aiding-and-abetting liability is that Keppel knew the misrepresentations in the EPC contracts were false at the time they were made but executed the contracts anyway, furthering the fraud. *See Cupersmith*, 2016 WL 5394712, at *16 (defendants' substantial assistance "allow[ed] the fraud scheme to continue undetected," despite plaintiffs "never [having] received or relied on any of Defendants' work product in making their investments"); *Abu Dhabi Com. Bank*, 888 F. Supp. 2d at 477 (evidence of substantial assistance raised issue of fact where, even though defendant made no misstatements, it "pushed forward" with ratings process despite "misgivings" of

59

their truthfulness); *Sheehy v. New Century Mortg. Corp.*, 690 F. Supp. 2d 51, 69-70, 73 (E.D.N.Y. 2010) (denying attorney's summary judgment motion on aiding and abetting fraud based on preparation of two false documents used to further the scheme, even though "it [was] undisputed that he never made any statements to plaintiff").

The evidence presents a genuine issue of fact on whether Keppel assisted the fraud by executing contracts that incorporated misrepresentations from Petrobras and Sete.

### 4. Keppel Aided the Fraud by Preparing Anti-Corruption Declarations

Keppel also prolonged the fraud by issuing false anti-corruption declarations. In December 2014, BNDES and other critical lenders delayed signing loan agreements with Sete and imposed new conditions precedent upon reports of Barusco's arrest. [ECF_144-2_at_134-135 ¶¶454-56]. Among other things, BNDES required each EPC contractor to submit declarations stating "there was no corruption." [ECF_144-2_at_134 ¶455]. Keppel, as with the shipyard visits, acquiesced and assisted Sete by drafting the anti-corruption declarations Sete needed to obtain BNDES's financing. [ECF_144-2_at_79 ¶272, 80 ¶275; ECF_151-89_at_3]. The declarations falsely stated that Keppel did not know of or provide corrupt payments for Sete contracts. [ECF_144-2_at_80 ¶¶275-276; ECF_151-91_at_4-5]. The anti-corruption declarations provided assurance to

60

BNDES and the other lenders, as the lenders agreed to reschedule long-term financing to February 6, 2015. [ECF_144-2_at_77 ¶268, 78 ¶270, 135-136 ¶457]. Keppel's conduct prolonged the continuation of the fraud on EIG.

The only case the District Court cited in analyzing this conduct is *Washington State Investment Board v. Odebrecht S.A.*, 2023 WL 5016787, at *15 (S.D.N.Y. Aug. 4, 2023). [ECF_158_at_33-34]. Presumably relying on *Odebrecht*, the Court concluded Keppel's actions were "irrelevant[] because (1) they postdate[d] EIG's last investment in Sete, which was made on January 6, 2015, and (2) there [was] no evidence that EIG saw or relied on these letters." [ECF_158_at_33, 39]. But the inquiry in *Odebrecht* concerned whether a defendant could be held directly and primarily liable for a misstatement plaintiff did not rely on. *Odebrecht*, 2023 WL 5016787, at *15. An aiding-and-abetting claim, by contrast, does not require reliance on an aider's misstatement. *Supra* pp.59-60. To the contrary, acts of concealment occurring even "in the aftermath" of the fraud may amount to substantial assistance. In *Elbit Systems, Ltd. v. Credit Suisse Grp.*, plaintiffs sufficiently alleged substantial assistance where defendant's "role in the aftermath of the fraud was to keep the fraudulent scheme hidden" for as long as possible. 917 F. Supp. 2d 217, 223, 230 (S.D.N.Y. 2013) (quotation marks and citation omitted). It mattered not the defendants had not "made any false statements" themselves. *Id.* at 228. The District Court's imposition of a

61

primary liability standard to determine whether Keppel's conduct substantially assisted the fraud was improper.

Moreover, the District Court failed to consider inferences a jury could draw regarding when Keppel drafted the anti-corruption declarations and whether EIG relied on them. While the executed anti-corruption declarations post-dated EIG's last investment, the evidence shows Keppel drafted these false documents in December 2014. [ECF_158_at_19; ECF_143-3_at_75 ¶719; ECF_144-2_at_79 ¶272]. Keppel sent the following internal email on December 18, 2014: "As approved by Jeff [Chow], please find attached the Anticorruption Letters to be sent to Sete." [ECF_151-89_at_3]. The same email chain indicates Keppel sent the draft anti-corruption declarations to Sete, because on January 8, 2015, a Keppel employee informed others that Sete had "accepted" "these letters," while BNDES had not. *Id*. The evidence also indicates EIG knew Keppel was drafting anti-corruption declarations. The day after BNDES issued its December 16, 2014 decision, Sete held a board meeting, which EIG attended. [ECF_144-2_at_134 ¶454; ECF_156-134_at_3-4]. Given the importance of this situation, a juror could reasonably infer EIG learned BNDES was requiring anti-corruption declarations and knew Keppel and others were going to provide them. *See* [ECF_144-2_at_43 ¶121, 131-132 ¶447]. Indeed, Sete informed its board, including EIG, that it would "keep shareholders aware of developments as they happen." [ECF_156-134_at_3].

62

Sete's situation with BNDES was of such import that the Brazilian president and Petrobras president personally met to discuss the matter, and placed pressure on BNDES to find a resolution. *Id.* A genuine issue of fact exists concerning whether Keppel's anti-corruption declarations substantially assisted the fraud.

Finally, the District Court erred in analyzing each conduct by Keppel in "piecemeal fashion." *In re Dana Corp.*, 574 F.3d at 152. Even if this Court finds this conduct on its own does not sufficiently support an inference of substantial assistance, the circumstances surrounding EIG's visits to Keppel's shipyard, together with evidence of Keppel's acts of concealment, raise a genuine issue of fact regarding Keppel's substantial assistance to the fraud. *See In re Par Pharm.*, 733 F. Supp. at 682 ("[w]hile the bribery alone did not assist the preparation of the misleading statements," "the combination of these defendants' participation in the bribery, knowledge of the securities fraud, and intentional inaction for their own benefit" were sufficient to plead aiding-and-abetting liability).

## **CONCLUSION**

This Court should reverse the District Court's grant of summary judgment to Keppel and vacate the judgment below.

63

Dated:  New York, New York
        July 19, 2024

                                 Respectfully submitted,

                                 /s/ Daniel B. Goldman
                                 Daniel B. Goldman
                                 Kerri Ann Law
                                 Claudia Pak
                                 Daniel M. Ketani
                                 Kramer Levin Naftalis & Frankel LLP
                                 1177 Avenue of the Americas
                                 New York, New York 10036
                                 Phone:  (212) 715-9100
                                 Fax:  (212) 715-8000

                                 *Attorneys for Plaintiffs-Appellants*
                                 *EIG Energy Fund XIV, L.P.,*
                                 *EIG Energy Fund XIV-A, L.P.,*
                                 *EIG Energy Fund XIV-B, L.P.,*
                                 *EIG Energy Fund XIV (CAYMAN), L.P.,*
                                 *EIG Energy Fund XV, L.P.,*
                                 *EIG Energy Fund XV-A, L.P.,*
                                 *EIG Energy Fund XV-B, L.P., and*
                                 *EIG Energy Fund XV (CAYMAN), L.P.,*

## <u>CERTIFICATE OF COMPLIANCE</u>

Daniel B. Goldman, an attorney for Plaintiffs-Appellants EIG, hereby certifies that:

I.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and Local Rule 32.1(a) because it contains 13,941 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

II.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

July 19, 2024

/s/ Daniel B. Goldman
Daniel B. Goldman