# 24-0969-cv

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

_____

EIG ENERGY FUND XIV, L.P., EIG ENERGY FUND XIV-A, L.P.,
EIG ENERGY FUND XIV-B, L.P., EIG ENERGY FUND XIV (CAYMAN), L.P.,
EIG ENERGY FUND XV, L.P., EIG ENERGY FUND XV-A, L.P.,
EIG ENERGY FUND XV-B, L.P., EIG ENERGY FUND XV (CAYMAN), L.P.,

*Plaintiffs-Appellants,*

v.

KEPPEL OFFSHORE & MARINE LTD.,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

## BRIEF FOR DEFENDANT-APPELLEE KEPPEL (PAGE PROOF BRIEF)

Peter T. Barbur
Rachel G. Skaistis
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

*Counsel for Defendant-Appellee
Keppel Offshore & Marine Ltd.*

October 18, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Defendant-Appellee Keppel Offshore & Marine Ltd. certify the following:

Defendant-Appellee Keppel Offshore & Marine Ltd. was renamed Seatrium Offshore & Marine Limited on April 28, 2023. Seatrium Offshore & Marine Ltd. is wholly-owned by Seatrium Limited, a publicly held company organized under the laws of Singapore.

As of March 11, 2024, the following entities own more than 10% of Seatrium Limited:

- Startree Investments Pte. Ltd., a nonpublic corporation. Startree Investment Pte. Ltd. is wholly owned by Fullerton Management Pte. Ltd., which is in turn wholly owned by the Ministry of Finance of the Republic of Singapore.

- Citibank Nominees Singapore Pte. Ltd., a nonpublic corporation. Citibank Nominees Singapore Pte Ltd. is wholly owned by Citibank, National Association, which is in turn wholly owned by Citigroup Inc., a publicly held company organized under the laws of Delaware.

i

- DBS Nominees Pte. Ltd., DBS Vickers Securities (Singapore) Pte. Ltd. and DBSN Services Pte. Ltd., all nonpublic corporations, combined own more than 10% of Seatrium Limited. These three corporations are wholly owned by DBS Group Holdings Ltd., a publicly held company organized under the laws of Singapore.

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .........................................i

TABLE OF AUTHORITIES ....................................................vi

PRELIMINARY STATEMENT ................................................1

COUNTERSTATEMENT OF THE CASE.....................................4

I.      PROCEDURAL HISTORY ...........................................4

II.     UNDISPUTED MATERIAL FACTS ...............................7

        A.      The Parties..................................................7

        B.      EIG's Investment in Sete.................................8

        C.      Keppel's Contracts with Sete ..........................10

        D.      Keppel's Involvement in the Bribery Scheme ...................10

        E.      Slide Decks and Investment Memoranda...........................11

        F.      Shipyard Visits by EIG and Agents ...................12

        G.      Engineering, Procurement and Construction Contracts......................13

        H.      Anticorruption Letters ..................................14

        I.      Public Denials of Wrongdoing.........................14

SUMMARY OF ARGUMENT ...............................................15

STANDARD OF REVIEW ..................................................17

ARGUMENT ....................................................................17

I.      COLLATERAL ESTOPPEL BARS EIG FROM BRINGING ITS
        AIDING AND ABETTING FRAUD CLAIMS AGAINST KEPPEL. ........17

        A.      This Court Must Consider Keppel's Collateral Estoppel
                Defense. .................................................18

Page

B. Issue Preclusion Should Have Applied To Bar EIG's Claims............19

1. The Issues in Both Proceedings Are Identical..........................19

2. The Issues Were Actually Decided and EIG Had a Full and Fair Opportunity To Litigate.............................................21

3. A Ruling on Personal Jurisdiction Can Have Issue Preclusive Effect. .......................................................22

C. The District Court Erred in Not Applying Issue Preclusion at the Motion to Dismiss Stage. ...............................................25

II. THE DISTRICT COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT TO KEPPEL ON ACTUAL KNOWLEDGE...........................................................................26

A. The District Court Applied the Proper Standard in Holding EIG Did Not Produce Any Evidence of Actual Knowledge. ....................28

1. The District Court Did Not Require EIG To Meet an Excessive Level of Specificity in Establishing Actual Knowledge. .......................................................28

2. The District Court Properly Relied on Non-Fraud Cases........32

3. EIG Failed To Meet Its Burden of Proof. .................................35

B. The District Court Properly Considered and Dismissed EIG's Arguments Regarding the Existence of an Interdependent Scheme. ........................................................................36

C. EIG's Arguments Concerning "Extraordinary Economic Motive" Are Facially Incorrect. ...........................................42

III. THE DISTRICT COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT TO KEPPEL ON SUBSTANTIAL ASSISTANCE. .......................................................................43

A. The District Court Correctly Rejected EIG's Argument that Interdependent Schemes Established Substantial Assistance............44

iv

**Page**

    1.    EIG's Interdependent Scheme Theory Improperly Conflates the Underlying Investment Fraud with Evidence of Bribery. ...................................................45

    2.    The District Court Properly Distinguished Cases Where Interdependent Schemes Exist. ....................................49

  B.  The District Court Appropriately Found that Keppel Did Not Participate in the Preparation of Specific Fraudulent Statements. ................................................................52

  C.  The District Court Independently Addressed Misstatements and Omissions Alleged by EIG and Properly Dismissed Each. ...............54

    1.    Keppel Made No Affirmative Misrepresentations During the Shipyard Tours and Owed No Duty To Disclose. ...............55

    2.    The District Court Properly Rejected EIG's Argument That Keppel's Consulting Agreements Constitute Substantial Assistance. ..............................................57

    3.    The District Court Properly Rejected EIG's Reliance on Keppel's Anti-Corruption Declarations and Public Denials of Wrongdoing. ...........................................58

    4.    The District Court Properly Rejected EIG's Reliance on the EPC Contracts. .................................................60

CONCLUSION ......................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2006 Frank Calandra, Jr. Irrevocable Tr. v. Signature Bank Corp.*,
  816 F. Supp. 2d 222 (S.D.N.Y. 2011), *aff'd*, 503 F. App'x 51 (2d
  Cir. 2012) .......................................................................................43

*ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*,
  957 F. Supp. 1308 (S.D.N.Y. 1997) .......................................47, 49, 50

*Accent Delight Int'l Ltd. v. Sotheby's*,
  No. 18-CV-9011(JMF), 2023 WL 2307179 (S.D.N.Y. Mar. 1,
  2023) ...................................................................................27, 32, 57

*Aetna Cas. & Sur. Co. v. Leahey Const. Co.*,
  219 F.3d 519 (6th Cir. 2000) ...............................................................39

*Anobile v. Pelligrino*,
  303 F.3d 107 (2d Cir. 2002) ................................................................18

*Armstrong v. McAlpin*,
  699 F.2d 79 (2d Cir. 1983) ..................................................................43

*Arnold Graphics Indus., Inc. v. Indep. Agent Ctr., Inc.*,
  775 F.2d 38 (2d Cir. 1985) ..................................................................25

*Barrett v. Tema Dev. (1988), Inc.*,
  463 F. Supp. 2d 423 (S.D.N.Y. 2006) ..................................................25

*Beck Chevrolet Co. v. Gen. Motors LLC*,
  787 F.3d 663 (2d Cir. 2015), *question answered*, 27 N.Y.3d 379
  (2016) .................................................................................................17

*Chemtex, LLC v. St. Anthony Enters., Inc.*,
  490 F. Supp. 2d 536 (S.D.N.Y. 2007) ..................................................58

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996) ................................................................43

*CRT Invs., Ltd. v. BDO Seidman, LLP*,
  925 N.Y.S.2d 439 (App. Div. 1st Dep't 2011) .....................................55

vi

**Page(s)**

*de Abreu v. Bank of Am. Corp.*,
   812 F. Supp. 2d 316 (S.D.N.Y. 2011) ...................................................27

*EIG Energy Fund XIV, L.P. v. Keppel Offshore & Marine Ltd.*,
   No. 18-CV-01047(PGG), 2020 WL 2319127 (S.D.N.Y. May 11,
   2020) ...................................................................................................6

*EIG Energy Fund XIV, L.P. v. Keppel Offshore & Marine Ltd.*,
   No. 18-CV-1047(PGG), 2024 WL 1195575 (S.D.N.Y. Mar. 20,
   2024) ...................................................................................................6

*EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*,
   246 F. Supp. 3d 52 (D.D.C. 2017), *aff'd*, 894 F.3d 339 (D.C. Cir.
   2018) ...........................................................................................passim

*EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*,
   621 F. Supp. 3d 30 (D.D.C. 2022), *aff'd and remanded*, 104 F.4th
   287 (D.C. Cir. 2024) ...........................................................................5

*EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*,
   No. 1-16-cv-00333(APM) (D.D.C. Sept. 5, 2024) ..............................6

*El Camino Res. Ltd. v. Huntington Nat'l Bank*,
   712 F.3d 917 (6th Cir. 2013) ..............................................................35

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura
   Holding Am., Inc.*,
   873 F.3d 85 (2d Cir. 2017) ............................................................32, 33

*Fed. Deposit Ins. Corp. v. First Interstate Bank of Des Moines, N.A.*,
   885 F.2d 423 (8th Cir. 1989) ..............................................................39

*Fezzani v. Dweck*,
   No. 99 CIV. 793, 2024 WL 3794412 (S.D.N.Y. Aug. 13, 2024)........40, 41

*Filler v. Hanvit Bank*,
   156 F. App'x 413 (2d Cir. 2005) ........................................................45

*Filler v. Hanvit Bank*,
   339 F. Supp. 2d 553 (S.D.N.Y. 2004), *aff'd*, 156 F. App'x 413 (2d
   Cir. 2005) ............................................................................................41

**Page(s)**

*Four Star Cap. Corp. v. Nynex Corp.*,
  No. 93-Civ.-3706, 1993 WL 350016 (S.D.N.Y. Sept. 9, 1993) ..........................26

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.*,
  LLC, 479 F. Supp. 2d 349 (S.D.N.Y. 2007) .....................................43, 47, 53, 61

*Gabriel Cap., L.P. v. NatWest Fin., Inc.*,
  94 F. Supp. 2d 491 (S.D.N.Y. 2000) .................................................38, 53, 54, 57

*GAF Corp. v. United States*,
  818 F.2d 901 (D.C. Cir. 1987) ................................................................................22

*Goldsmith v. Mayor & City Council of Baltimore*,
  987 F.2d 1064 (4th Cir. 1993) ...............................................................................23

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*,
  331 F. Supp. 3d 221 (S.D.N.Y. 2018) ....................................................................40

*Harte v. Iberia Airlines*,
  No. 02 CIV.3624(LMM), 2002 WL 1870251 (S.D.N.Y. Aug. 13,
  2002) ......................................................................................................................25

*Heinert v. Bank of Am. N.A.*,
  835 F. App'x 627 (2d Cir. 2020) ............................................................................37

*High Tides, LLC v. DeMichele*,
  931 N.Y.S.2d 377 (App. Div. 2d Dep't 2011) .......................................................60

*Hightower v. Cohen*,
  No. CV-08-3229(RJD)(RM), 2009 WL 9042127 (E.D.N.Y. Sept.
  30, 2009) ...........................................................................................................47, 55

*In re Agape Litig.*,
  681 F. Supp. 2d 352 (E.D.N.Y. 2010) ....................................................................55

*In re Agape Litig.*,
  773 F. Supp. 2d 298 (E.D.N.Y. 2011) .........................................................40, 42, 56

*In re Par Pharmaceuticals Inc. Sec. Litig.*,
  733 F. Supp. 668 (S.D.N.Y. 1990) .........................................................................54

**Page(s)**

*In re PCH Assocs.*,
    949 F.2d 585 (2d Cir. 1991) ...................................................................19

*In re Red Dot Scenic, Inc.*,
    313 B.R. 181 (Bkrtcy. S.D.N.Y. 2004) ..................................................21

*In re Refco Inc. Sec. Litig.*,
    No. 07-MD-1902(JSR), 2012 WL 12941970 (S.D.N.Y. Feb. 10,
    2012), *aff'd sub nom. Krys v. Pigott*, 749 F.3d 117 (2d Cir. 2014)..............47, 48

*ITT Corp. v. United States*,
    963 F.2d 561 (2d Cir. 1992) ...................................................................19

*JP Morgan Chase Bank v. Winnick*,
    406 F. Supp. 2d 247 (S.D.N.Y. 2005) ..................................................27, 37, 42

*KDH Consulting Grp. v. Iterative Cap. Mgmt. L.P.*,
    528 F. Supp. 3d 192 (S.D.N.Y. 2021) ...................................................59

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
    916 F. Supp. 2d 442 (S.D.N.Y. 2013) ...................................................42

*Kirschner v. Bennett*,
    648 F. Supp. 2d 525 (S.D.N.Y. 2009) ...................................................46

*LaFleur v. Whitman*,
    300 F.3d 256 (2d Cir. 2002) ...................................................................22

*LaRocca v. Gold*,
    662 F.2d 144 (2d Cir. 1981) ...................................................................19

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) ..................................................................26, 43

*Markowits v. Friedman*,
    42 N.Y.S.3d 218 (App. Div. 2d Dep't 2016)........................................55

*Matosantos Com. Co. v. Applebee's Int'l, Inc.*,
    2 F. Supp. 2d 191 (D.P.R. 1998).............................................................24

ix

**Page(s)**

*Matosantos Com. Corp. v. Applebee's Int'l, Inc.,*
   245 F.3d 1203 (10th Cir. 2001) ................................................24, 25, 26

*McNally Wellman Co., a Div. of Boliden Allis v. N.Y State Elec. &*
   *Gas Corp.,*
   63 F.3d 1188 (2d Cir. 1995) ................................................................18

*Morin v. Trupin,*
   711 F. Supp. 97 (S.D.N.Y. 1989) .........................................................53

*Nathel v. Siegal,*
   592 F. Supp. 2d 452 (S.D.N.Y. 2008) ..................................................51

*NCAS Realty Mgmt. Corp. v. Nat'l Corp. for Hous. P'ships,*
   143 F.3d 38 (2d Cir. 1998) ...................................................................17

*New Hampshire v. Maine,*
   532 U.S. 742 (2001) ..............................................................................19

*Nigerian Nat. Petroleum Corp. v. Citibank, N.A.,*
   No. 98 CIV. 4960(MBM), 1999 WL 558141 (S.D.N.Y. July 30,
   1999) .....................................................................................................30

*Oster v. Kirschner,*
   905 N.Y.S.2d 69 (App. Div. 1st Dep't 2010) .................................27, 39

*Paraflon Invs., Ltd. v. Fullbridge, Inc.,*
   960 F.3d 17 (1st Cir. 2020)..............................................................59, 61

*Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.,*
   426 F.3d 617 (2d Cir. 2005) .................................................................17

*Pennington v. D'Ippolito,*
   855 F. App'x 779 (2d Cir. 2021) .....................................................27, 36

*Pension of Univ. of Montreal v. Banc of Am.,*
   446 F. Supp. 2d 163 (S.D.N.Y. 2006) ..................................................31

*Pittman v. Grayson,*
   149 F.3d 111 (2d Cir. 1998) .................................................................21

**Page(s)**

*Postlewaite v. McGraw-Hill*,
  333 F.3d 42 (2d Cir. 2003) ...................................................................19

*Primavera Familienstifung v. Askin*,
  130 F. Supp. 2d 450 (S.D.N.Y. 2001) ..............................................31

*Purdy v. Zeldes*,
  337 F.3d 253 (2d Cir. 2003) ...............................................................20

*Renner v. Chase Manhattan Bank*,
  No. 98 CIV. 926(CSH), 2000 WL 781081 (S.D.N.Y. June 16,
  2000), *aff'd*, 85 F. App'x 782 (2d Cir. 2004) .....................................37

*Rosner v. Bank of China*,
  349 F. App'x 637 (2d Cir. 2009) .........................................................40

*Rosner v. Bank of China*,
  No. 06-CV-13562, 2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008),
  *aff'd*, 349 F. App'x 637 (2d Cir. 2009)..........................................27, 30

*Roth v. McAllister Bros.*,
  316 F.2d 143 (2d Cir. 1963) ..............................................22, 23, 25

*RX Data Corp. v. Dep't of Soc. Servs.*,
  684 F.2d 192 (2d Cir. 1982) ...............................................................22

*Ryan v. Hunton & Williams*,
  No. 99-CV-5938 (JG), 2000 WL 1375265 (E.D.N.Y. Sept. 20,
  2000) .............................................................................................36, 37

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
  346 F. Supp. 3d 473 (S.D.N.Y. 2018) ................................................38

*Stagg, P.C. v. U.S. Dep't of State*,
  983 F.3d 589 (2d Cir. 2020) ...............................................................23

*Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*,
  883 N.Y.S.2d 486 (App. Div. 1st Dep't 2009)...................................55

*Stengel v. Black*,
  486 F. App'x 181 (2d Cir. 2012) .........................................................22

xi

**Page(s)**

*Unity House, Inc. v. First Com. Fin. Grp., Inc.*,
  175 F.3d 1022 (7th Cir. 1999), 1999 WL 164924 ............................22

*Vasquez v. Hong Kong & Shanghai Banking Corp. Ltd.*,
  No. 18-Civ.-1876(PAE), 2019 WL 2327810 (S.D.N.Y. May 30,
  2019) *reconsideration denied*, 2019 WL 3252907 (S.D.N.Y. July
  19, 2019) ............................30

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012) ............................32, 34

*Wight v. BankAmerica Corp.*,
  219 F.3d 79 (2d Cir. 2000) ............................42

*Zamora v. FIT Int'l Grp. Corp.*,
  834 F. App'x 622 (2d Cir. 2020) ............................30

*Zayed v. Associated Bank, N.A.*,
  913 F.3d 709 (8th Cir. 2019) ............................34

*Zherka v. City of N.Y.*,
  459 F. App'x 10 (2d Cir. 2012) ............................19

## Statutes & Rules

Fed. R. Civ. P. 12(b)(1) ............................4

Fed. R. Civ. P. 12(b)(6) ............................4

## Other Authorities

18A Charles Alan Wright & Arthur R. Miller, Federal Practice and
  Procedure § 4435 (3d ed. 2024) ............................22

18 Moore's Federal Practice § 132.03[3][a] (3d ed.) ............................21

## PRELIMINARY STATEMENT

This lawsuit marks the second attempt by Plaintiffs-Appellants EIG Energy Fund XIV, L.P., *et al.* (collectively, "EIG") to hold Defendant-Appellee Keppel Offshore & Marine Ltd. ("Keppel") responsible for EIG's investment losses in the Brazilian offshore oil industry. EIG alleges that Keppel aided and abetted Petróleo Brasileiro S.A. ("Petrobras") and Sete Brasil Participações S.A. ("Sete") in defrauding EIG into investing hundreds of millions of dollars in Sete, supposedly without knowledge that Petrobras and Sete were engaging in a bribery and kickback scheme with drillship builders. However, as the District Court here held in a detailed and comprehensive decision granting summary judgment for Keppel, EIG failed to adduce any evidence to support its claim against Keppel.

EIG's claim actually should have been dismissed at the motion to dismiss stage on the basis of issue preclusion. EIG's first lawsuit against Keppel was in the District Court for the District of Columbia ("D.D.C."), where EIG alleged that Keppel had conspired with Petrobras to defraud EIG based on exactly the same facts at issue here. The D.D.C. squarely rejected those claims on the merits, finding that the facts alleged could not support a claim for conspiracy to defraud. Those findings apply equally to EIG's claim here, and EIG was never entitled to a second bite at the apple in this lawsuit.

In any event, the District Court's summary judgment ruling properly concluded that EIG has adduced no evidence that Keppel aided and abetted fraud. In its ruling, the District Court made detailed and meticulous findings, explicitly addressing every piece of evidence cited by EIG. And while EIG labors mightily to obscure the point, EIG does not dispute any of the facts as set forth in the District Court's decision. EIG's only objection to the District Court's ruling is its application of the law, but EIG's arguments regarding actual knowledge and substantial assistance contradict prevailing precedent.

This case is not about, and has never been about, whether Keppel paid bribes to secure drillship contracts from Sete. That is not disputed. Rather, this case is about whether Keppel knowingly and substantially assisted Petrobras and Sete in inducing EIG's investment in Sete through misrepresentations. EIG misleadingly confuses and seeks to equate (a) Keppel's participation in the bribery scheme to secure drillship contracts from Sete; with (b) the scheme by Petrobras and Sete to induce EIG's investment in Sete. However, these are entirely distinct wrongs and New York law is clear that independent schemes of this nature cannot be used interchangeably to support a claim of aiding and abetting fraud.

To survive summary judgment, EIG must adduce sufficient evidence that (1) Keppel had actual knowledge of Petrobras and Sete's underlying fraud to

mislead EIG; and (2) Keppel provided substantial assistance in inducing EIG to invest.  EIG fails to marshal evidence of either.

*First*, as to actual knowledge, EIG argues that the District Court applied an overly narrow interpretation of the knowledge standard.  However, the District Court considered all of EIG's arguments and proffered evidence—both specific and general—and found them wanting.  EIG's arguments are premised upon six specific documents—four pitch decks and two information memoranda—EIG says it relied on when making its investment decision.  However, EIG does not dispute that Keppel had no knowledge that these investor materials were sent to EIG.  Rather, EIG treats these documents as "red flag" materials that EIG says should have put Keppel on notice of the possibility of fraud.  But that is an argument for constructive knowledge rather than actual knowledge, which is inadequate as a matter of law.  EIG's arguments about interdependent schemes fail because there were no interdependent schemes to defraud here.  EIG is simply and improperly conflating Keppel's awareness of the bribery scheme with an entirely independent scheme by Petrobras and Sete to defraud EIG.

*Second*, as to substantial assistance, the District Court properly considered that Keppel had no role in creating certain specific investment materials because those specific materials were the crux of EIG's fraud claim.  And, in any event, the District Court did not stop its review of the evidence there, but rather

3

also addressed four other categories of alleged misstatements or omissions, and appropriately dismissed each. The District Court similarly considered and dismissed EIG's theory concerning interdependent schemes in connection with substantial assistance, finding that EIG failed to establish that Keppel's bribery was symbiotic with Petrobras and Sete's underlying investment fraud.

For the reasons set forth below, the District Court's grant of summary judgment in favor of Keppel should be affirmed.

## COUNTERSTATEMENT OF THE CASE

### I.    PROCEDURAL HISTORY

In 2016, EIG filed a lawsuit in federal court in the District of Columbia relating to the exact same fraud at issue here and seeking as damages the exact same losses at issue here. *See EIG Energy Fund XIV, L.P. v. Petróleo Brasiliero S.A.*, 246 F. Supp. 3d 52, 61 (D.D.C. 2017) ("*D.D.C. Opinion*"), *aff'd*, 894 F.3d 339 (D.C. Cir. 2018). EIG asserted claims for fraud and aiding and abetting fraud against Petrobras and asserted claims for conspiracy to defraud against Petrobras, Keppel and two other shipyard defendants. Keppel moved to dismiss for failure to state a claim under Rule 12(b)(6) and for lack of personal jurisdiction under Rule 12(b)(1). EIG's "only proffered basis for the court exercising jurisdiction over" Keppel was the District of Columbia's long-arm statute under a theory of conspiracy jurisdiction whereby Keppel's contacts with

4

Petrobras and Sete supposedly supplied "the necessary contacts with the District of Columbia". *Id.* at 89-90. Under that theory, jurisdiction "cannot exist unless" a complaint "states a plausible claim of civil conspiracy". *Id.* at 90.

On March 30, 2017, the D.D.C. granted Keppel's motion to dismiss both with respect to failure to state a claim and with respect to lack of jurisdiction. *Id.* at 91. The D.D.C. concluded that EIG came "nowhere close to stating a sufficient claim of civil conspiracy" amongst Keppel, Sete, Petrobras and the other shipyard defendants. *Id.* at 90. Indeed, EIG did "not even plead[] facts establishing that [Keppel] knew Sete had equity investors to be defrauded", nor that Keppel was "aware Petrobras conceived of capitalizing Sete with equity investments; prepared marketing materials . . . [or had] transmitted such materials to the United States". *Id.* at 90. The D.D.C. found no facts to infer that Keppel agreed to defraud Sete's investors. *Id.* at 91. Critically, the D.D.C. also concluded it could not infer from concealment of the bribery scheme any "agreement to defraud Sete's investors" and "conceive[d] of any number of reasons" why the bribery scheme was not disclosed, namely to avoid implication in criminal wrongdoing. *Id.*[1]

---

[1] The D.D.C. case continued against Petrobras, and EIG eventually obtained summary judgment as to liability on its fraud and aiding and abetting claims. *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*, 621 F. Supp. 3d 30, 75, 79 (D.D.C. 2022), *aff'd and remanded*, 104 F.4th 287 (D.C. Cir. 2024). At a damages trial scheduled for March 31, 2025, EIG will be entitled to recover as damages all

Having failed to move forward against Keppel in the D.D.C., EIG filed its complaint in the underlying action in the Southern District of New York on February 6, 2018, asserting claims for RICO conspiracy and aiding and abetting fraud. [(ECF_17.)] On May 11, 2020, the District Court (Gardephe, J.) granted Keppel's motion to dismiss the RICO claim, leaving only EIG's state law aiding and abetting fraud claim. *EIG Energy Fund XIV, L.P. v. Keppel Offshore & Marine Ltd.*, No. 18-CV-01047(PGG), 2020 WL 2319127 (S.D.N.Y. May 11, 2020), [(ECF_45.)]. The District Court rejected Keppel's argument that the doctrines of claim and issue preclusion barred EIG's claims. [(ECF_45_at_22-23.)]

On November 9, 2021, following months of document and deposition discovery, Keppel and EIG cross-moved for summary judgment. [(ECF_97; ECF_104.)] After combing through nearly 1,000 undisputed material facts and hundreds of exhibits, on March 20, 2024, the District Court issued a detailed decision granting Keppel's motion for summary judgment, denying EIG's motion for summary judgment and entering judgment for Keppel for two independent reasons. *EIG Energy Fund XIV, L.P. v. Keppel Offshore & Marine Ltd.*, No. 18-CV-1047(PGG), 2024 WL 1195575 (S.D.N.Y. Mar. 20, 2024),

---

of the losses for which it seeks recovery. Order, *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*, No. 1-16-cv-00333(APM) (D.D.C. Sept. 5, 2024), ECF No. 210.

6

[(ECF_158_("Opinion"))].  *First*, EIG could not demonstrate a dispute over whether Keppel had actual knowledge that Petrobras and Sete fraudulently had induced EIG to invest in Sete.  [(ECF_158_at_31 (Opinion.31).)]  *Second*, EIG could not demonstrate a dispute over whether Keppel substantially assisted the fraud.  [(ECF_158_at_40 (Opinion.40).)]  EIG now appeals this judgment.

## II.    UNDISPUTED MATERIAL FACTS[2]

### A.    The Parties

Keppel is a company that "specializes in offshore rig design, construction and shipbuilding".  [(ECF_158_at_2-3 (Opinion.2-3).)]  Plaintiffs are "energy investment funds managed by EIG Management Company, LLC".  [(ECF_158_at_2 (Opinion.2).)]  "Petrobras is an oil company controlled by the Brazilian government."  [(ECF_158_at_3 (Opinion.3).)]

In 2010, Petrobras established Sete, a partnership between Petrobras, private investors and public pension funds to build ultra-deepwater drillships after the discovery of a massive oil field off the coast of Brazil.  [(*Id.*)]  Petrobras "installed" its own employees as Sete's most senior executives, including João Ferraz and Pedro José Barusco Filho.  [(*Id.*)]  As EIG acknowledges, Keppel had no role in creating Sete.  [(*Id.*)]

---

[2] All of the facts set forth herein are taken directly from the District Court's decision and none of them are disputed by EIG.

**B.** **EIG's Investment in Sete**

EIG aggressively pursued the opportunity to invest in Sete—a process in which Keppel had no involvement.  EIG first learned of Sete in 2010 through its Senior Vice President, Kevin Corrigan.  [(ECF_158_at_4 (Opinion.4).)]  Corrigan contacted and subsequently met with Ferraz in Brazil to discuss "if EIG could participate".  [(*Id.*)]  "There is no evidence [that] anyone at Keppel was involved in or aware of any of [these] discussions."  [(ECF_158_at_5 (Opinion.5).)]

By June 3, 2011, Corrigan was already reporting to Sete's financial advisor that "the decision to invest [in Sete] has been made internally".  [(*Id.*)]  EIG's due diligence culminated in an investment recommendation, which Corrigan presented to EIG's investment committee for approval on June 27, 2011.  [(ECF_158_at_6 (Opinion.6).)]  The investment recommendation's sole reference to Keppel consisted of five bullets regarding a "[p]otential" shipyard at BrasFELS, Keppel's Brazilian subsidiary.  [(*Id.* (alteration in original))]  Consistent with this description, by the time EIG had determined to invest in Sete, Keppel had not received a single contract to build drillships.  [(*Id.*)]  EIG's CEO admitted he did not know whether Keppel would ever get a contract from Sete.  [(*Id.*)]

The same day as Corrigan's presentation, EIG's investment committee approved the Sete investment.  [(*Id.*)]  On June 30, 2011, EIG executed an Investment Agreement with Sete and its investment advisor, for an investment

8

of up to approximately 160 million USD.  [(ECF_158_at_7 (Opinion.7).)]  On

September 8, 2011, the parties executed an amendment which doubled the

maximum investment amount.  [(*Id.*)][3]  Keppel was not a party to these contracts.

EIG's characterization of these agreements as "conditional investment agreements

with Sete" and "still far from final" is irrelevant.  [(Dkt._25.1_Pls.'-

Appellants'_Br._("Br.")_28.)]  The District Court specifically noted EIG's

contention that these agreements did not obligate EIG to invest in Sete, and the

District Court's decision did not rely on them in any way.  [(ECF_158_at_7

(Opinion.7).)]

In July 2012, EIG entered into an investment commitment with Sete

whereby EIG committed to meet capital calls made by Sete and subsequently made

13 payments between August 3, 2012 and January 6, 2015, totaling approximately

221 million USD.  [(ECF_158_at_7-9 (Opinion.7-9).)]  Keppel was not a party to

the Investment Commitment Agreement dated July 31, 2012, nor other related

agreements EIG executed the same day.

---

[3] Also in September 2011, the investment committee approved investment in
Sete from a second EIG fund.  [(ECF_158_at_6-7 (Opinion.6-7.))]  The September
investment recommendation included the same five bullets about BrasFELS.
[(ECF_158_at_7 (Opinion.7.))]

9

### C.     Keppel's Contracts with Sete

Between 2011 and 2012, Sete contracted with five companies (one of which was Keppel) to build ultra-deepwater drillships.  [(ECF_158_at_11 (Opinion.11).)]  In December 2011—six months after EIG's investment committee approved the Sete investment—Keppel executed its first Engineering, Procurement and Construction ("EPC") contract with Sete to build one drillship. [(ECF_158_at_3 (Opinion.3).)]  In April 2012, Keppel entered into a letter of intent to build five more drillships and executed formal contracts to do so in August 2012.  [(ECF_158_at_4 (Opinion.4).)]  EIG was not a party to any of these contracts.  [(*Id.*)]

### D.     Keppel's Involvement in the Bribery Scheme

In February 2015, news reports emerged connecting Keppel to a bribery scheme with Petrobras and Sete.  [(ECF_158_at_10_20 (Opinion.10, 20).)] Sete was subsequently unable to secure financing and eventually entered bankruptcy.  [(ECF_158_at_20 (Opinion.20).)]  Keppel entered into a deferred prosecution agreement with the U.S. Department of Justice on December 22, 2017 for its alleged violation of the Foreign Corrupt Practices Act (the "DPA") and agreed to pay a $105,554,245 penalty.  [(ECF_158_at_10 (Opinion.10).)]  The DPA notes that Keppel had engaged in a years-long bribery scheme with Petrobras and Sete, paying bribes to obtain business in Brazil [(ECF_158_at_10-11

10

(Opinion.10-11))], and Keppel also executed contracts with its consultant, Zwi Skornicki, to facilitate the payment of kickbacks through Skornicki's companies, allowing Keppel to obtain business from Petrobras and Sete [(ECF_158_at_10 (Opinion.11-12))]. Consistent with the separate and distinct nature of Keppel's involvement in the bribery scheme, these arrangements pre-dated EIG's involvement with Sete. [(ECF_158_at_11 (Opinion.11); Br.8.)]

The DPA does not reference EIG, nor does it charge Keppel with defrauding Sete's investors or conspiring to do so. [(ECF_158_at_13 (Opinion.13).)]

*    *    *

EIG has pointed to threads of evidence purporting to tie Keppel to Petrobras and Sete's scheme to defraud investors. The District Court carefully examined all of this evidence and ultimately concluded that none of it supported EIG's claims.

### E.    Slide Decks and Investment Memoranda

EIG purportedly relied on four slide decks and two information memoranda in deciding to invest in Sete, none of which mentioned the bribery scheme. [(ECF_158_at_13-14 (Opinion.13-14).)][4] Of these six documents, there

---

[4] These documents include (1) a 2010 slide deck entitled "The Drilling Rigs Project: Petrobras' Strategy for its successful implementation", (2) a January 2010 "Confidential Information Memorandum: Pre-Salt Drilling Rigs Project", (3) a

11

is "no evidence . . . Keppel received" or "knew about" four of them or knew that they were shared with EIG. [(ECF_158_at_15 (Opinion.15); ECF_144-1_at_10-11 ¶¶ 44-47; ECF_143-2_at_14 ¶¶ 44-47.)] As EIG's brief acknowledges [(Br.13-14)], Keppel received just two slide decks: (1) "Sete Brasil Participações S/A Management Presentation" and (2) "The Drilling Rigs Project: Petrobras' Strategy for its successful implementation" [(ECF_158_at_14-15 (Opinion.14-15))]. The District Court assumed Keppel employees read these documents and observed they did not disclose bribery.[5] [(ECF_158_at_15 (Opinion.15).)] It is undisputed, however, that there is no evidence Keppel knew whether "other entities, if any, received" these documents. [(*Id.*)]

## F. Shipyard Visits by EIG and Agents

Corrigan and other EIG personnel visited the shipyard of Keppel's Brazilian subsidiary, BrasFELS, three times between August 2011 and June 2013. [(ECF_158_at_16 (Opinion.16).)] EIG does not contend that Keppel made misrepresentations during any of these shipyard visits. [(ECF_158_at_17

---

January 2011 slide deck entitled "Investment Memorandum: FIP Sondas", (4) a September 2011 document entitled "Sete Brasil Participações Private Placement Confidential Information Memorandum", (5) an October 2010 slide deck entitled "Sete Brasil: Pre-Salt Oil Rigs Project" and (6) an August 2011 slide deck entitled "Sete Brasil Participações S/A Management Presentation". [(ECF_158_at_13-14 (Opinion.13-14).)]

[5] The Drilling Rigs presentation did include a boilerplate disclaimer for U.S. investors but did not name EIG. [(ECF_158_at_16, 29 (Opinion.16, 29).)]

(Opinion.17).)]  "It is undisputed that (1) none of the visitors to the shipyard asked Keppel representatives about bribery and/or corruption; and (2) none of the Keppel representatives disclosed the bribery scheme."  [(*Id.*)]  Also in August 2011, a video company EIG hired visited the BrasFELS shipyard "to film a video for EIG's annual investors' meeting".  [(*Id.*)]  The five-minute video does not mention Keppel or BrasFELS, nor are their names or logos shown.  [(ECF_158_at_17n.9 (Opinion.17n.9).)]

### G.  Engineering, Procurement and Construction Contracts

As stated, Keppel signed its first EPC contract with Sete in December 2011 and five subsequent EPC contracts in August 2012.  [(ECF_158_at_3-4, 18 (Opinion.3-4, 18).)]  These contracts obligated Keppel to act "in compliance with . . . Applicable Laws".  [(ECF_158_at_18 (Opinion.18).)]  Keppel warranted that it "is not in violation of any Applicable Law . . . [that] would materially and adversely affect its performance of any obligations under this Agreement".  [(*Id.*)]  EIG does not contend that it either read or relied on these signed contracts in making its decision to invest in Sete.  [(ECF_158_at_20 (Opinion.20).)]

EIG did review a draft EPC contract in the course of its due diligence that contained similar terms to the EPC contracts Keppel would later sign.  [(ECF_158_at_18 (Opinion.18).)]  EIG does not contend, however, that Keppel prepared or even knew about this draft contract, which appears to have been

13

created by "Petrobras and/or Sete . . . as a template to be used by any company that was awarded a contract to build drillships". [(*Id.*)] In fact, EIG's own filings make clear that Keppel first commented on a draft EPC contract in August 2011 [(Br.12)], two months after "Corrigan received a final draft of an EPC contract" [(ECF_143-1_at_53 ¶ 339)].

## H.    Anticorruption Letters

In 2014—three years after EIG's 2011 decision to invest in Sete— Sete asked Keppel to prepare "anticorruption letters" to obtain unrelated bank financing. [(ECF_158_at_18-19 (Opinion.18-19).)] Keppel approved drafts of the letters in December 2014, and they were executed in January 2015. [(ECF_158_at_19 (Opinion.19).)] EIG does not claim it read or relied on these letters in making its investment decision. [(ECF_158_at_20 (Opinion.20).)] Nor could it, as the letters postdate EIG's final cash disbursement to Sete by 10 days. [(ECF_158_at_9, 33 (Opinion.9, 33).)]

## I.    Public Denials of Wrongdoing

On February 5, 2015, news reports appeared concerning Petrobras and Keppel's involvement in a bribery scheme. [(ECF_158_at_19 (Opinion.19).)] Keppel denied involvement in a series of press releases and a letter to customers. [(*Id.*)] EIG does not claim it relied on these denials in making its investment decision. [(ECF_158_at_20 (Opinion.20).)] Each of these documents postdate

14

EIG's final cash disbursement to Sete, in one case by almost nineteen months.

[(ECF_158_at_9, 33-34 (Opinion.9, 33-34).)]

## SUMMARY OF ARGUMENT

I.     The District Court should have dismissed EIG's claims at the motion to dismiss stage because EIG is collaterally estopped from relitigating the underlying issues.  The D.D.C. has already ruled on whether Keppel had actual knowledge of Petrobras and Sete's scheme to defraud and whether Keppel assisted any such fraud, finding that EIG failed to allege any facts in support of its claims. This ruling should have precluded EIG from relitigating these issues before the District Court.

II.     The District Court did not err in determining there was insufficient evidence for a reasonable jury to conclude that Keppel had actual knowledge of the underlying investment fraud.  Taking all reasonable inferences in EIG's favor, the undisputed facts show that Keppel was unaware that certain specific communications—which EIG relies on heavily in marshalling its aiding and abetting cases—were transmitted to and thus relied on by EIG.  Furthermore, there is no evidence that suggests Keppel had actual knowledge of the underlying scheme to defraud.  EIG attempts to manufacture errors in the District Court's approach, arguing (a) that the District Court purportedly required evidence of "specific communications" and (b) that it relied on non-fraud cases to create an

overly narrow standard.  But neither is true.  The District Court considered the specific communications to which EIG pointed and, in addition, considered whether more general or circumstantial evidence of actual knowledge existed.  It found none.  And the District Court's analysis of non-fraud cases reflected an appropriate effort to highlight the difference between actual and constructive knowledge, the former being the relevant standard.

III.    The District Court did not err in holding, as an independent ground for granting summary judgment, that EIG failed to adduce sufficient evidence of substantial assistance.  It correctly considered and properly dismissed EIG's arguments regarding interdependent schemes.  EIG fails to assert the symbiosis required for an interdependent scheme to exist, and EIG's arguments improperly conflate Keppel's bribery—a distinct wrong—with Petrobras and Sete's scheme to defraud EIG.  Finally, the District Court considered all of EIG's arguments regarding the various purported assistance provided by Keppel, including the allegedly misleading marketing materials provided by Petrobras and Sete, and Keppel's own purported misstatements and omissions.  After thorough analysis, the District Court properly concluded that when making its investment decision, EIG exclusively relied on behavior that (i) did not involve Keppel; (ii) did not induce EIG to invest; or (iii) simply did not constitute substantial assistance.  In

16

fact, EIG fails to point to any inferences the District Court refused to make in its favor or any facts the District Court supposedly overlooked.

## STANDARD OF REVIEW

This court "review[s] *de novo* the district court's grant of summary judgment, affirming only if the movant has demonstrated that there is no genuine issue as to any material fact and, hence, that judgment as a matter of law is warranted." *Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 625 (2d Cir. 2005). Where the facts on appeal are undisputed, as they are here, the Court conducts *de novo* review only of the law and application of law to fact. *See Beck Chevrolet Co. v. Gen. Motors LLC*, 787 F.3d 663, 672 (2d Cir. 2015), *question answered*, 27 N.Y.3d 379 (2016); *NCAS Realty Mgmt. Corp. v. Nat'l Corp. for Hous. P'ships*, 143 F.3d 38, 42 (2d Cir. 1998).

## ARGUMENT

## I. COLLATERAL ESTOPPEL BARS EIG FROM BRINGING ITS AIDING AND ABETTING FRAUD CLAIMS AGAINST KEPPEL.

EIG is collaterally estoped from relitigating issues it raised and that were already decided in the D.D.C. action. In that action, EIG alleged a count of conspiracy against Petrobras, Sete and three shipyard defendants, which included Keppel, "premised on the theory that Defendants conspired to conceal the existence of the Sete bribe scheme in an effort to fraudulently induce Plaintiffs, and other investors, to invest in Sete." *D.D.C. Opinion*, 246 F. Supp. 3d at 61.

17

The D.D.C. held that EIG had not sufficiently pled the elements of a civil conspiracy and, on that basis, found it did not have personal jurisdiction under the District of Columbia long-arm statute. *Id.* at 90-91. This ruling is dispositive of EIG's efforts to relitigate these issues in the District Court here.

Keppel raised the collateral effects of the D.D.C.'s rulings on this action at the motion to dismiss stage, and the District Court erred by concluding that a ruling on personal jurisdiction grounds cannot have preclusive effects. [(ECF_45_at_23.)] This issue was fully briefed and is ripe for this Court's consideration.

### A. This Court Must Consider Keppel's Collateral Estoppel Defense.

On appeal, this Court must consider the defense Keppel appropriately raised in the lower court action. *Anobile v. Pelligrino*, 303 F.3d 107, 115 (2d Cir. 2002) ("[A] final judgment . . . incorporates all previous interlocutory judgments in that case and permits their review on appeal."); *see also McNally Wellman Co., a Div. of Boliden Allis v. N.Y. State Elec. & Gas Corp.*, 63 F.3d 1188, 1194 (2d Cir. 1995) (holding an appeals court can affirm "on any ground supported by the record"). And where collateral estoppel has been "briefed by the parties in the district court", this Court is "not precluded on appeal from affirming on the ground that [plaintiff's] claim is barred by the principle of issue preclusion", even where

18

the district court ruled on the merits.  *See LaRocca v. Gold*, 662 F.2d 144, 148 (2d Cir. 1981).

### B.    Issue Preclusion Should Have Applied To Bar EIG's Claims.

"Issue preclusion [or collateral estoppel] generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law". *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001).  Collateral estoppel applies when "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *In re PCH Assocs.*, 949 F.2d 585, 593 (2d Cir. 1991).  Here, all four of the requirements are clearly satisfied.

### 1.    The Issues in Both Proceedings Are Identical.

"To meet the identity-of-issues prong of collateral estoppel, it is not necessary that the issues be exactly identical; it is sufficient that 'the issues presented in [the earlier litigation] are substantially the same as those presented by [the later] action.'" *Zherka v. City of N.Y.*, 459 F. App'x 10, 13 (2d Cir. 2012) (alterations in original) (quoting *ITT Corp. v. United States*, 963 F.2d 561, 564 (2d Cir. 1992)).  In fact, collateral estoppel applies "regardless of whether the two suits are based on the same cause of action." *Postlewaite v. McGraw-Hill*, 333

F.3d 42, 48 (2d Cir. 2003). The fact that elements of a claim previously litigated overlap with a current claim is indicative that this first prong of collateral estoppel is met. *See Purdy v. Zeldes*, 337 F.3d 253, 258 (2d Cir. 2003) (finding that "considerable overlap between issues" barred a duplicative suit). EIG's conspiracy claim and the D.D.C.'s findings in its conspiracy jurisdiction analysis are substantially identical to EIG's current claim of aiding and abetting fraud and its underlying factual allegations.

EIG's civil conspiracy claim required EIG to allege "not just that Petrobras and the Shipyard Defendants participated in a bribe scheme, but that they agreed not to disclose the bribe scheme *for the purpose* of defrauding Sete's investors". *D.D.C. Opinion*, 246 F. Supp. 3d at 90. The D.D.C. found that EIG failed to do so. *Id.* Key among the D.D.C.'s findings was that EIG failed to sufficiently allege that the "Shipyard Defendants agreed to defraud Sete's investors"; that Keppel was aware of any Petrobras or Sete investor materials would be transmitted to the United States; or that Keppel's "mere concealment of the bribe scheme [was] an agreement to defraud Sete's investors". *Id.* at 91. The same issues are the basis for the present action. To establish its common law aiding and abetting fraud claim, EIG must establish that Keppel had actual knowledge of the scheme to defraud EIG and provided substantial assistance for the purpose of defrauding EIG through its failure to disclose the bribery scheme.

20

(*See infra* Sections II-III.)  And like aiding and abetting fraud, liability for conspiracy also requires showing actual knowledge and action in furtherance of a wrong.  *See Pittman v. Grayson*, 149 F.3d 111, 122-23 (2d Cir. 1998).

EIG does not—and cannot—contest that the issues are identical.  At the motion to dismiss stage, EIG relied solely on the procedural argument that issue preclusion was not available because these issues were resolved as part of a decision in which the D.D.C. found it lacked personal jurisdiction. [(ECF_26_at_24-25.)]  But, as discussed below, that is wrong as a matter of law. (*See infra* Section I.B.3.)

### 2. The Issues Were Actually Decided and EIG Had a Full and Fair Opportunity To Litigate.

 "As a general rule, when a question of fact is put in issue by the pleadings, is submitted to the trier of fact for its determination, and is determined, that question of fact has been 'actually litigated.'"  *In re Red Dot Scenic, Inc.*, 313 B.R. 181, 187 (Bkrtcy. S.D.N.Y. 2004) (quoting 18 Moore's Federal Practice § 132.03[3][a] at 132-81 (3d ed.)).  At the motion to dismiss stage, EIG never challenged that these elements of the collateral estoppel analysis had been satisfied.  In fact, the same questions of fact at issue here—whether Keppel knew and helped Petrobras and Sete mislead EIG into investment—were pled as part of EIG's civil conspiracy claim and reviewed by the D.D.C. as part of its personal jurisdiction analysis.  (*See supra* Section I.B.1.)  For the same reason, it is clear

21

that EIG "was fully able to raise the same factual or legal issues . . . assert[ed in the prior proceeding]". *LaFleur v. Whitman*, 300 F.3d 256, 274 (2d Cir. 2002).

### 3. A Ruling on Personal Jurisdiction Can Have Issue Preclusive Effect.

The only point of disagreement at the motion to dismiss stage was whether a decision on personal jurisdiction could create preclusive effects. The law is clear that it can. Indeed, it is axiomatic that "a dismissal for lack of jurisdiction . . . preclude[s] relitigation of the issues determined in ruling on the jurisdiction question". 18A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4435 (3d ed. 2024); *see also Stengel v. Black*, 486 F. App'x 181, 183 (2d Cir. 2012) ("Although a dismissal for lack of jurisdiction is not an adjudication of the merits of a claim, such a dismissal precludes re-litigation of the issue it decided."). "[A]ny fact upon which that [jurisdictional] decision is grounded may serve as the basis for an estoppel by judgment in any later action". *Roth v. McAllister Bros.*, 316 F.2d 143, 145 (2d Cir. 1963). Extensive caselaw confirms that the D.D.C.'s determinations on these issues are entitled to preclusive effect.[6]

---

[6] *See RX Data Corp. v. Dep't of Soc. Servs.*, 684 F.2d 192, 198-99 (2d Cir. 1982) (holding personal jurisdiction ruling collaterally estops parties from reasserting the same issues); *GAF Corp. v. United States*, 818 F.2d 901, 913 (D.C. Cir. 1987) (finding a party is "precluded from relitigating any issue of fact or law determined against it in the first action which it had full opportunity to litigate", even if part of a jurisdictional determination); *Unity House, Inc. v. First Com. Fin. Grp., Inc.*, 175 F.3d 1022 (7th Cir. 1999) (table), 1999 WL 164924, at

22

For example, in *Roth v. McAllister Bros.*, this Court affirmed that a defendant was collaterally estopped from relitigating issues a court had determined as part of a jurisdictional ruling. *Id.* at 144-45. In that case, in concluding it lacked jurisdiction, a workers' compensation court determined the nature of a sailor's employment at the time he was injured. *Id.* at 145. In a later case on a maritime common law claim, a district court held that the defendant could not relitigate that it was plaintiff's employer at the time of plaintiff's injury because of the compensation court's ruling. *Id.* at 144. Similarly, in *Stagg, P.C. v. U.S. Department of State*, this Court made clear its rulings had "preclusive effect, even though [its] ultimate conclusion [was] that [it] lack[ed] Article III jurisdiction". 983 F.3d 589, 605 n.9 (2d Cir. 2020) (citing *Roth*, 316 F.2d at 143). In so doing, the Court held the parties would not be able to relitigate whether plaintiff's activities were subject to an allegedly impermissible licensing and registration scheme, because the Court had determined this issue in holding that plaintiff had not sufficiently alleged an Article III injury in its jurisdictional determination. *Id.* at 605 & n.9, 609.

---

*2 (giving preclusive effect to an agency determination made in the context of a jurisdictional dismissal); *Goldsmith v. Mayor & City Council of Baltimore*, 987 F.2d 1064, 1069 (4th Cir. 1993) ("[A] jurisdictional dismissal that does not constitute a judgment on the merits so as to completely bar further transactionally-related claims still operates to bar relitigation of issues actually decided by that former judgment.").

In *Matosantos Commercial Corp. v. Applebee's International, Inc.*, the Tenth Circuit affirmed the District of Kansas's grant of summary judgment based on collateral estoppel. 245 F.3d 1203, 1207 (10th Cir. 2001). There, the District of Puerto Rico dismissed plaintiff's original action, because defendant did not fall under Puerto Rico's long-arm statute. *Id.* at 1206. "One of the dispositive issues raise[d] in the personal jurisdiction analysis was whether [defendant] had 'assumed liability'" under a contract. *Id.* (quoting *Matosantos Com. Co. v. Applebee's Int'l, Inc.*, 2 F. Supp. 2d 191, 195 (D.P.R. 1998)). In later litigation where jurisdiction was not disputed, the District of Kansas concluded plaintiff was not permitted to relitigate whether defendant assumed these contractual obligations. *Id.* at 1208-13. *Matosantos*'s facts are strikingly similar to the facts here, where the D.D.C. ruled it lacked personal jurisdiction over Keppel under D.C.'s long-arm statute, because EIG failed to allege that Keppel had known about or aided any efforts to defraud EIG. *D.D.C. Opinion*, 246 F. Supp. 3d at 90. These determinations were necessary to the D.D.C.'s conclusion that it lacked personal jurisdiction because conspiracy allegations must be considered "in tandem" with a jurisdictional analysis where conspiracy jurisdiction is alleged. *Id.* EIG does not dispute this. Thus, EIG should not have been permitted to relitigate these same issues.

C. **The District Court Erred in Not Applying Issue Preclusion at the Motion to Dismiss Stage.**

Both the District Court and EIG improperly conflated claim preclusion with issue preclusion by arguing in essence that a court "without jurisdiction . . . consequently lack[s] jurisdiction to make any determination whatsoever". *Roth*, 316 F.2d at 145. Instead, issues determined in a jurisdictional analysis must have preclusive effect, because "a tribunal always possesses jurisdiction to determine its jurisdiction". *Id.*

In fact, each case relied upon by the District Court is distinguishable. For example, the collateral estoppel analysis in *Barrett v. Tema Development (1988), Inc.* turned not on whether earlier judgments were final or "on the merits", but on whether the issues were sufficiently "identical". 463 F. Supp. 2d 423, 426-28 (S.D.N.Y. 2006). The court highlighted how "the causes of action" and "the facts" underlying plaintiff's claims were "substantially different". *Id.* at 428. This Court declined to apply issue preclusion in *Arnold Graphics Industries, Inc. v. Independent Agent Center, Inc.*, for the same reason. 775 F.2d 38, 41-42 (2d Cir. 1985). And as the Tenth Circuit has explained, "[a]ny reliance on *Arnold*" for the proposition that "a jurisdictional issue decided in a case dismissed for lack of personal jurisdiction can be relitigated in a subsequent suit as it pertains to the merits represents confusion over the difference between collateral estoppel and [*res judicata*]". *Matosantos*, 245 F.3d at 1210 n.5. Finally, in *Harte v. Iberia*

25

*Airlines*, the court held *res judicata* could not apply in an instance where the district court *had not* considered the same substantive issues as part of its jurisdictional analysis as were at stake in the later case. No. 02 CIV.3624(LMM), 2002 WL 1870251, at *2 (S.D.N.Y. Aug. 13, 2002).[7]

For the reasons set forth above, collateral estoppel bars EIG from repackaging its previously rejected civil conspiracy claim against Keppel as an aiding and abetting claim based on the same facts.

## II. THE DISTRICT COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT TO KEPPEL ON ACTUAL KNOWLEDGE.

To establish liability for aiding and abetting fraud under New York law, "the plaintiffs must show (1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006). Here it is undisputed that the underlying fraud at issue is Petrobras and Sete's deceit of EIG to secure EIG's investment in Sete. Accordingly, the District Court focused its analysis on the second and third elements of the claim.

---

[7] EIG's briefing on this issue at the motion to dismiss stage, relied chiefly on these three cases, in addition to *Four Star Capital Corp. v. Nynex Corp.*, No. 93-Civ.-3706, 1993 WL 350016 (S.D.N.Y. Sept. 9, 1993), which, as described by the Tenth Circuit, "failed to recognize substantial authority contrary to its decision" and misapplied *Arnold. Matosantos*, 245 F.3d at 1210 n.5.

In order "[t]o satisfy the knowledge prong" of an aiding and abetting fraud claim under New York law "a plaintiff must demonstrate that the defendant had actual knowledge of the underlying fraud." *Pennington v. D'Ippolito*, 855 F. App'x 779, 783 (2d Cir. 2021) (citing *Oster v. Kirschner*, 905 N.Y.S.2d 69, 72 (App. Div. 1st Dep't 2010)). No lesser degree of knowledge can satisfy this requirement; in particular, "constructive knowledge—the possession of information that would cause a person exercising reasonable care and diligence to become aware of the fraud—is insufficient." *de Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316, 322 (S.D.N.Y. 2011); *Rosner v. Bank of China*, No. 06-CV-13562, 2008 WL 5416380, at *7-8 (S.D.N.Y. Dec. 18, 2008) (holding that "willful blindness" or "conscious avoidance" do not satisfy the actual knowledge requirement), *aff'd*, 349 F. App'x 637 (2d Cir. 2009); *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 253 (S.D.N.Y. 2005) (same). "Marshaling evidence of actual knowledge sufficient to survive summary judgment is not an easy task", and here, EIG has failed to meet its burden. *Accent Delight Int'l Ltd. v. Sotheby's*, No. 18-CV-9011(JMF), 2023 WL 2307179, at *19 (S.D.N.Y. Mar. 1, 2023).

EIG does not claim that the District Court failed to consider any material fact. Nor does it argue that any of the relevant pertinent facts are disputed. Rather, EIG makes three main arguments: (i) the District Court supposedly required too much specificity; (ii) the District Court supposedly

27

misapplied the law regarding interdependent fraudulent schemes; and (iii) the

District Court supposedly failed to consider Keppel's "extraordinary economic

motive".  Each objection falls flat.

### A.    The District Court Applied the Proper Standard in Holding EIG Did Not Produce Any Evidence of Actual Knowledge.

EIG argues that the District Court took an "unduly restrictive"

approach in considering Keppel's knowledge of Petrobras and Sete's scheme to

defraud EIG by requiring "specific" evidence of awareness.  [(Br.2, 27-29.)]

However, in so arguing, EIG misrepresents the District Court's opinion, confuses

the District Court's application of non-fraud cases and ignores EIG's failure to

establish that Keppel knew EIG was not aware of the underlying bribery scheme.

### 1.    The District Court Did Not Require EIG To Meet an Excessive Level of Specificity in Establishing Actual Knowledge.

EIG misrepresents the District Court decision by asserting that it

required EIG to meet an excessive level of "specificity" in marshalling evidence of

actual knowledge.  [(Br.33.)]  EIG wrongly suggests that the District Court

considered only whether Keppel had actual knowledge of "specific

communications".  [(Br.30 (emphasis omitted).)]  To the contrary, the District

Court also explicitly considered whether there was evidence that Keppel was either

(a) aware of a general strategy by Petrobras and Sete to defraud EIG or (b) was

instructed not to disclose the bribery scheme.  [(ECF_158_at_29-30 (Opinion.29-

28

30).)]  As to these broader evidentiary theories, the District Court did not require EIG to prove "Keppel's knowledge of each specific representation alleged". [(ECF_158_at_29 (Opinion.29).)]  Instead, the District Court simply held that EIG failed to proffer any evidence showing that Keppel had actual knowledge that Petrobras and Sete were defrauding EIG, beyond the "red flag" documents discussed below.  [(*Id.*)]

Moreover, the District Court addressed "specific communications" because they are precisely what EIG says it relied on when it was defrauded. [(ECF_147_at_23-27.)]  Having urged the District Court to focus on these specific communications, EIG should not now be heard to criticize the District Court for doing exactly that.  And when it did focus on these specific communications, the District Court properly concluded that, "[d]rawing all reasonable inferences in favor of EIG," the record establishes only that Keppel knew "(1) EIG was an investor in Sete; (2) Petrobras and Sete were perpetrating a bribery scheme; and (3) some Petrobras/Sete investor materials . . . which Keppel received . . . did not disclose the bribery scheme."  [(ECF_158_at_28 (Opinion.28).)]  Even taking these as true, the District Court found no evidence that "Keppel knew" that any of these documents were "communicated to EIG".  [(ECF_158_at_28-29 (Opinion.28-29).)]

29

On appeal, EIG again argues that Keppel's actual knowledge is evidenced by "specific facts". [(Br.at 27.)] In particular, it points to three pitch decks sent to EIG from Petrobras and Sete concerning the Sete project. [(*Id.*)] EIG notes that these decks did not disclose any fraud, and it does not disagree with the District Court's conclusion that there is no evidence Keppel knew that EIG reviewed these decks. [(*Id.*)] It is further undisputed that the disclaimer in one of these pitch decks that EIG faults for not disclosing Petrobras and Sete's fraud is boilerplate and does not refer to EIG. [(ECF_158_at_28-29 (Opinion.28-29).)]

EIG contends that this evidence is sufficient to establish actual knowledge. [(Br.27-28.)] That is incorrect. This Court has previously explained that even a "host of red flags concerning" the underlying fraud is not sufficient to establish actual knowledge. *Zamora v. FIT Int'l Grp. Corp.*, 834 F. App'x 622, 628 (2d Cir. 2020). For example, documents "riddled with . . . badges of fraud" are not sufficient to create an inference of actual knowledge. *Nigerian Nat. Petroleum Corp. v. Citibank, N.A.*, No. 98 CIV. 4960(MBM), 1999 WL 558141, at *1, *8 (S.D.N.Y. July 30, 1999). Nor are "patterns" of suspicious behavior. *Vasquez v. Hong Kong & Shanghai Banking Corp. Ltd.*, No. 18-Civ.-1876(PAE), 2019 WL 2327810, at *16 (S.D.N.Y. May 30, 2019) *reconsideration denied*, 2019 WL 3252907 (S.D.N.Y. July 19, 2019); *see also Rosner*, 2008 WL 5416380, at *6 (finding that "the repeated transfer and nearly daily withdrawal of large sums of

30

cash over the course of several years" was insufficient to create an inference of actual knowledge).  And even "ignorance of obvious warning signs of fraud" cannot form the basis of actual knowledge.  *Pension of Univ. of Montreal v. Banc of Am.*, 446 F. Supp. 2d 163, 202-03 (S.D.N.Y. 2006).  The omission of information from these decks is a far cry from an "obvious warning sign", which nevertheless is not sufficient to establish an inference of actual knowledge.  EIG cannot—and does not—point to any cases calling into question the District Court's conclusion that "red flag" documents concern constructive knowledge, not actual knowledge.

EIG asserts that plaintiffs in other cases "have successfully defeated summary judgment motions with evidence of knowledge that was far less specific than what the District Court demanded here."  [(Br.33.)]  EIG misrepresents the holdings in those cases.  [(*Id.*)]  For example, EIG points to *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450 (S.D.N.Y. 2001) to argue that the District Court should have "infer[ed]" from these pitch decks that Keppel had knowledge that Petrobras and Sete had made misrepresentations to EIG.  [(Br.33-34.)]  However, in *Primavera* the court relied on several pieces of direct evidence indicating the brokers' knowledge that they were assisting the fraudster in misleading investors, such as the brokers' practice of changing their investment assessments based on the fraudster's request, notwithstanding the fact they knew

31

those changes were incorrect—one broker's communications even noted such changes were "defrauding investors". 130 F. Supp. 2d at 507. Similarly in *Accent Delight International Ltd. v. Sotheby's*, plaintiffs adduced direct evidence of actual knowledge, including that one of the defendants "adjusted his estimated valuations of" artwork, allowing fraudster to sell the works at inflated prices to plaintiffs. 2023 WL 2307179, at *20.

## 2. The District Court Properly Relied on Non-Fraud Cases.

EIG incorrectly accuses the District Court of applying the wrong legal standard because the District Court relied, in part, on non-fraud cases. [(Br.29-33.)] What EIG conveniently fails to mention is that the District Court discussed these cases in response to EIG's attempt to draw a distinction between circumstantial evidence of actual knowledge (which EIG argues would be sufficient) and constructive knowledge, which is indisputably insufficient to satisfy the requirements for an aiding and abetting claim. [(ECF_112_at_18-21.)] Because there are no fraud cases addressing this distinction, the District Court properly addressed certain non-fraud cases. Furthermore, EIG wrongly characterizes the District Court's analysis of this Court's holdings in those cases: *Federal Housing Finance Agency for Federal National Mortgage Ass'n v. Nomura Holding America, Inc.*, 873 F.3d 85 (2d Cir. 2017) and *Viacom International, Inc. v. YouTube, Inc.*, 676 F.3d 19, 31 (2d Cir. 2012).

32

EIG argues that the District Court used these cases to create an "overly narrow view of the knowledge element" that requires a high degree of specific evidence. [(Br.31.)] This misunderstands the District Court's analysis. The District Court's consideration of these cases was limited to delineating the difference between constructive knowledge and circumstantial evidence of actual knowledge. [(ECF_158_at_25-27 (Opinion.25-27).)] And the District Court's primary conclusion from these cases was that "the Second Circuit's teaching in *Nomura* and *Viacom* [indicates] that 'red flag' documents showing the defendant's awareness of a probability of fraud do not amount to actual knowledge". [(ECF_158_at_27 (Opinion.27).)] EIG notably does not challenge that conclusion, and EIG's attempts to distinguish each case are unpersuasive.

With regard to *Nomura*, EIG claims the case is inapposite because this Court was interpreting a statute that requires plaintiff to prove "that it did not know that the *specific* statement . . . was false". [(Br.31.)] But the District Court did not rely on *Nomura* to require knowledge of specific instances of fraudulent misstatements from Petrobras and Sete to EIG. [(ECF_158_at_25-27 (Op.25-27).)] Rather, the District Court relied on the case for the proposition that actual knowledge cannot be "inferred" from a party's general experience—as that would be the equivalent of a constructive knowledge standard. (*Id.* at 26 (citing *Nomura*, 873 F.3d at 123).) In fact, *Nomura* explains that the very type of evidence EIG

33

seeks to rely on here, is evidence of constructive knowledge: "[Actual knowledge] is to be distinguished from knowing that there was a risk that the statement was false and from knowing that other similar statements in the same prospectus or other prospectuses were false." 873 F.3d at 122-23. EIG similarly tries to distinguish *Viacom* by stating that this Court's interpretation was colored by the "text of the statute". [(Br.32.)] However, that misreads the District Court's application of the case. The *Viacom* Court's statutory interpretation was meant to determine whether Congress intended to apply "general awareness" or constructive knowledge as opposed to an "actual knowledge" standard under the statute. 676 F.3d 19, 31. This Court ultimately held that the general evidence concerning infringement rates on YouTube could not be used to infer YouTube had actual knowledge of particular instances of infringement. *Id.* Based on these cases, the District Court concluded that the ability to deduce that someone is engaging in wrongdoing is not the equivalent of actual knowledge. [(ECF_158_at_27 (Opinion.27).)] The District Court's interpretation of the Second Circuit's guidance on this issue is consistent with the holdings of other circuits.[8]

---

[8] The Eighth Circuit in applying Minnesota law, which is substantively similar to New York aiding and abetting law, has held that "[w]hile knowledge may be shown by circumstantial evidence, courts stress that the . . . . plaintiff must show more than awareness of the conduct in question . . . , that it raised red flags, . . . or even that it amounted to gross negligence, but must show that the defendant was aware of the *wrongfulness* of the challenged conduct." *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 715 (8th Cir. 2019) (citations and quotations omitted). The Eighth Circuit affirmed a grant of summary judgment, reasoning that the "record

### 3. EIG Failed To Meet Its Burden of Proof.

Even had EIG been able to prove that Keppel knew EIG received misleading communications—and it has not—EIG would still have failed to meet its burden. It is undisputed that there is no evidence Keppel knew EIG was unaware of the bribery scheme. As Keppel argued in its summary judgment motion, "there is no evidence Keppel knew EIG was acting on the basis of any misrepresentation". [(ECF_149-1_at_26.)] For all Keppel knew, EIG could have been aware of the bribery scheme and nonetheless decided to invest in Sete. The record establishes that EIG executives had many direct contacts with the principal actors at Petrobras and Sete. [(ECF_144-3_at_14 ¶¶ 22-23.)] And it is undisputed that EIG officials were aware of a history of corruption in Brazil. For example, a 2014 EIG White Paper mentioned "recurrent concerns about transparency and corruption" in Brazil. [(ECF_144-3_at_12 ¶17.)] In addition, EIG's CEO Blair Thomas testified that "if the question is did I know that Brazilian construction firms had a checkered history on corruption, the answer is yes." [(ECF_144-3_at_12 ¶18.)]

---

contain[ed] no direct evidence" that the accused aiders and abettors "knew of the [underlying] scheme". *Id.* Similarly, the Sixth Circuit in applying Michigan law, which is also substantively similar to New York law, rejected the notion that "'general awareness' of the wrongful conduct is sufficient" and affirmed a grant of summary judgment because the record was "devoid of direct or circumstantial evidence that [the alleged aider and abettor] had actual knowledge of the specific torts perpetrated by [the fraudster]." *El Camino Res. Ltd. v. Huntington Nat'l Bank*, 712 F.3d 917, 922-23 (6th Cir. 2013).

EIG's only response to this argument is to attempt to reverse the burden of proof and fault Keppel for failing to provide evidence that Keppel executives believed EIG was unaware of the bribery scheme. [(ECF_149-1_at_26.)] That is not the relevant question. A plaintiff seeking to establish actual knowledge must show that the defendant knew the plaintiff was unaware of the truth. *See Ryan v. Hunton & Williams*, No. 99-CV-5938 (JG), 2000 WL 1375265, at *6 (E.D.N.Y. Sept. 20, 2000) ("[T]here is no indication that [defendant] knew that [plaintiff] was acting on the basis of mistaken knowledge concerning the financial transaction between [fraudster] and [plaintiff]."). For example, in *Pennington v. D'Ippolito*, this Court affirmed a grant of summary judgment on an aiding and abetting fraud claim, in part, because plaintiff had not shown defendant knew plaintiff was being misled. 855 F. App'x at 784. EIG's failure to establish that Keppel knew EIG was not aware of the bribery scheme is an independent basis for affirming the District Court's conclusion that EIG failed to establish actual knowledge.

### B. The District Court Properly Considered and Dismissed EIG's Arguments Regarding the Existence of an Interdependent Scheme.

EIG also confuses its arguments about the purported "specificity" the District Court required with the issue of whether Keppel's actual knowledge can be

36

inferred from "surrounding circumstances" and the concept of interdependent schemes.  [(Br.27.)]

EIG asserts that Keppel's purported actual knowledge of the underlying fraud could be inferred from "surrounding circumstances".  [(*Id.*)] However, EIG's argument boils down to the notion that Keppel should have realized Sete was misleading investors due to its own involvement in a bribery scheme with Petrobras and Sete.  But what Keppel could or should have deduced is irrelevant.  *Heinert v. Bank of Am. N.A.*, 835 F. App'x 627 (2d Cir. 2020) ("[A]llegations concerning what the Banks should have realized about [two fraudsters] . . . at most give rise to inferences of constructive knowledge."); *see also Renner v. Chase Manhattan Bank*, No. 98 CIV. 926(CSH), 2000 WL 781081, at *8 (S.D.N.Y. June 16, 2000) (finding that what a defendant should have known is "irrelevant" to actual knowledge), *aff'd*, 85 F. App'x 782 (2d Cir. 2004); *Ryan*, 2000 WL 1375265, at *9 (holding that suspicion of fraudulent activity "do[es] not raise an inference of actual knowledge").  The fact that a defendant "was put on notice of potential misconduct, does not suffice; suspicion, without confirmation, does not satisfy the actual knowledge requirement for a claim of aiding and abetting fraud."  *Winnick*, 406 F. Supp. 2d at 255.

Moreover, all of the cases EIG cites for the proposition that actual knowledge can be inferred by surrounding circumstances are distinguishable

because they involve direct awareness of the fraud. For example, in *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, the court noted that while, unlike other defendants' employees, Merrill Lynch's employees had not "blunt[ly] state[d]" their awareness of the underlying fraud, their notes had described their work on transactions for fraudster Enron as "income statement manipulation", "'doing a favor' for Enron" and "'aid[ing]/abet[ting] Enron's financial statement manipulation'". 346 F. Supp. 3d 473, 495-96 (S.D.N.Y. 2018). Plaintiffs also adduced evidence of statements that showed employees' awareness that Enron was using specific partnerships to create an appearance of high income and low debt—one of the main ways Enron misled investors. *Id.* at 496-97 (listing specific statements in employees' notes). The other case EIG cites similarly did not require the broad inferential leap EIG argues the District Court should have taken here. *See Gabriel Cap., L.P. v. NatWest Fin., Inc.*, 94 F. Supp. 2d 491, 496, 511 (S.D.N.Y. 2000) (finding actual knowledge could be inferred where defendants had witnessed misstatements to investors firsthand).

Furthermore, EIG's reliance on cases involving interdependent schemes falls flat because EIG improperly seeks to conflate Keppel's bribery scheme with an entirely separate scheme to defraud. Indeed, all of the cases EIG cites involve evidence (or allegations) that demonstrate the defendants' knowledge of the very same underlying fraudulent scheme, not some other wrongdoing. As

38

EIG admits, in *Oster v. Kirschner*, defendants had actual knowledge of "misrepresentation in the various" private placement memoranda, which were the "vehicle[s] by which investment in the Ponzi scheme was carried out". 905 N.Y.S.2d at 72. In *Aetna Casualty & Surety Co. v. Leahey Construction Co.*, the plaintiffs alleged that the defendant fraudulently manipulated the financial position of its company to induce the plaintiff to agree to bond the company's construction projects. 219 F.3d 519, 524 (6th Cir. 2000). The court concluded that one set of defendants had actual knowledge of the underlying fraud because they were experienced bank officers who had conducted these types of bond loans before, and had reviewed and approved the fraudster's bonding loan documents that contemplated a highly unusual repayment period that would inflate the company's financial position. *Id.* at 535-36. Inflating the company's financial position was the key to the fraudster's ability to induce the plaintiffs' investment and thus carry out the fraud. *Id.* at 524. Similarly, in *Federal Deposit Insurance Corp. v. First Interstate Bank of Des Moines, N.A.*, the court concluded the bank had actual knowledge because, among other things, the plaintiffs adduced evidence that higher-ups at the defendant bank "foreclosed" attempts by more junior bank officers to call regulatory authorities and report the fraudster for stealing bank securities. 885 F.2d 423, 432-33 (8th Cir. 1989).

39

Unlike the plaintiffs in these cases, EIG essentially asks this Court to infer that Keppel had actual knowledge of Petrobras and Sete's deception of EIG based only on Keppel engaging in bribery to secure contracts with Petrobras and Sete. However, "the Court is not required to make inferential leaps that are unsupported by any evidence in the record." *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 331 F. Supp. 3d 221, 247 (S.D.N.Y. 2018). Indeed, what the caselaw establishes is that it is improper to conflate knowledge of an entirely different illegal scheme (or of general wrongdoing) with actual knowledge of the underlying primary fraud, for purposes of establishing actual knowledge in an aiding and abetting claim. *See Rosner v. Bank of China*, 349 F. App'x 637, 639 (2d Cir. 2009) ("Even if [defendant] had reason to suspect that [a fraudster] was [engaged in money laundering], this does not mean that [defendant] had actual knowledge of the fraudulent scheme perpetrated by [the fraudsters]."); *In re Agape Litig.*, 773 F. Supp. 2d 298, 313 (E.D.N.Y. 2011) (granting a motion to dismiss and explaining that the bank defendant's "knowledge that [a brokerage firm] was acting improperly in one capacity does not raise a strong inference that [the bank] had actual knowledge of the underlying fraudulent scheme.").

In *Fezzani v. Dweck*, the plaintiffs, who alleged fraudsters had induced them to buy stocks in a pump and dump scheme, sued two allegedly favored investors who received buy-backs at a guaranteed profit. No. 99 CIV. 793,

40

2024 WL 3794412, at *1 (S.D.N.Y. Aug. 13, 2024). The court held that plaintiffs did not sufficiently marshal evidence to show that the favored investors had actual knowledge of misrepresentations to plaintiffs even though one "allegedly [had] heavy involvement in the [fraudster's] enterprise generally". *Id.* at *9. The court further held that general awareness of wrongdoing, including "knowledge of investigations or press articles about wrongdoing", was an "insufficient basis to find an inference of actual knowledge in the absence of other indicia of more specific knowledge of the [fraudster's] dealings with Plaintiffs." *Id.* at *9. Similarly, in *Filler v. Hanvit Bank*, the plaintiffs alleged three banks assisted a company in defrauding its investors through a merger. 339 F. Supp. 2d 553, 557 (S.D.N.Y. 2004), *aff'd*, 156 F. App'x 413 (2d Cir. 2005). The court dismissed the aiding and abetting claims against the banks because "[p]laintiffs [did] not allege that defendants were actually aware of the representations made to plaintiffs by" the company. *Id.* at 560. The court explained that "the underlying fraud of which defendants were allegedly aware and which they assisted is not the defrauding of these plaintiffs during the merger, but the defrauding of any investor who would have relied on [the company's] financial statements. Such a broad definition of the underlying fraud is inconsistent with the other requirements of establishing aiding and abetting liability". *Id.*

41

### C.    EIG's Arguments Concerning "Extraordinary Economic Motive" Are Facially Incorrect.

Finally, EIG argues the District Court "disregarded evidence of Keppel's extraordinary economic motive". [(Br.38.)]  That is flat out wrong.  The District Court explicitly did consider and properly rejected this argument.  Indeed, the District Court noted that EIG was arguing (incorrectly) that it could "raise a material issue of fact by demonstrating scienter in lieu of actual knowledge". [(ECF_158_at_30 (Opinion.30).)]

Both at summary judgment and on appeal, EIG cites to cases that are either entirely distinguishable, or that consider economic motive in the context of determining whether sufficient evidence of scienter has been alleged—not whether sufficient evidence of actual knowledge has been adduced.  [(*See* Br.39 (quoting *Wight v. BankAmerica Corp.*, 219 F.3d 79, 92 (2d Cir. 2000).)]  However, "[t]he 'knowledge' element of an aiding and abetting fraud claim is not identical to the scienter required for the underlying fraud." *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 916 F. Supp. 2d 442, 448 (S.D.N.Y. 2013).  In fact, scienter can be established by "circumstantial evidence of . . . recklessness", while actual knowledge cannot. *In re Agape Litig.*, 773 F. Supp. 2d at 308 (quoting *Winnick*, 406 F. Supp. 2d at 253 n.4).  Regardless, even if two concepts could be equated, the profit motives to which EIG points here, which could be "imputed to any publicly-owned, for-profit endeavor, [are] not sufficiently concrete for purposes of

42

inferring scienter". *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996).

EIG's argument in this regard is therefore entirely inapposite and should be

ignored.

## III.   THE DISTRICT COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT TO KEPPEL ON SUBSTANTIAL ASSISTANCE.

The District Court also properly granted summary judgment to Keppel

on the basis that no reasonable juror could find that Keppel substantially assisted

any underlying investment fraud perpetrated by Petrobras and Sete against EIG.  A

showing of substantial assistance requires evidence that a defendant "affirmatively

assist[ed], help[ed] conceal or fail[ed] to act when required to do so, thereby

enabling the breach to occur." *2006 Frank Calandra, Jr. Irrevocable Tr. v.*

*Signature Bank Corp.*, 816 F. Supp. 2d 222, 237 (S.D.N.Y. 2011) (quoting *Lerner*,

459 F.3d at 295), *aff'd*, 503 F. App'x 51 (2d Cir. 2012).  This showing "is

intimately related to the concept of proximate cause." *Fraternity Fund Ltd. v.*

*Beacon Hill Asset Mgmt.*, LLC, 479 F. Supp. 2d 349, 370 (S.D.N.Y. 2007)

(quotations omitted).  Thus, as this Court has explained, neither awareness nor

approval alone "constitute substantial assistance". *Armstrong v. McAlpin*, 699

F.2d 79, 92 (2d Cir. 1983).  Instead, the evidence must establish that the defendant

"proximately caused the harm on which the primary liability is predicated".

*Fraternity Fund*, 479 F. Supp. 2d at 370.  It does not do so here.

43

The District Court appropriately concluded that EIG did not adduce any evidence that Keppel substantially assisted Petrobras and Sete in misleading EIG.  In fact, on appeal, EIG does not challenge any of the District Court's factual findings in this respect, or point to any evidence it supposedly overlooked. Instead, EIG offers three arguments, none of which holds water:  (i) the District Court supposedly did not properly consider the impact of interdependent schemes on EIG's evidentiary burden; (ii) the District Court supposedly focused too heavily on specific documents; and (iii) the District Court supposedly did not properly analyze the impact of Keppel's purportedly misleading omissions.

### A. The District Court Correctly Rejected EIG's Argument that Interdependent Schemes Established Substantial Assistance.

EIG argues that the District Court gave short shrift to its efforts to show substantial assistance by establishing Keppel's purported participation in an interdependent fraud. [(Br.43-48.)]  Not so.  EIG raised, and the District Court expressly considered, interdependent schemes as one of the several possible bases upon which to find substantial assistance.  [(ECF_158_at_34-37 (Opinion.34-37).)] And its opinion should be affirmed on at least two independent grounds.

*First*, as shown below, central to EIG's interdependent fraud theory is evidence that Keppel was involved in paying bribes, and Petrobras, Sete and Keppel all benefited from that bribery scheme.  But the caselaw is clear that establishing an interdependent scheme requires evidence that a defendant

44

participated in an *independent* fraud that directly assisted the complained-of fraud. EIG does not and cannot cite any authority applying the concept of interdependent schemes where, as here, one scheme involved fraud and the other scheme involved an entirely different alleged wrong.

     *Second*, with no legal support for its position, EIG misleadingly relies on cases involving interdependent schemes to defraud where a defendant is concededly involved in one fraudulent scheme and that scheme assists another fraud. That these courts considered together two interrelated frauds does not support EIG's argument that entirely distinct bribery and fraud schemes should be considered together. The District Court correctly distinguished the limited circumstances in which courts have relied upon interdependent schemes to find substantial assistance.

### 1. EIG's Interdependent Scheme Theory Improperly Conflates the Underlying Investment Fraud with Evidence of Bribery.

     EIG's interdependent fraud theory relies on evidence of Keppel's bribery to attempt to show that Keppel substantially assisted in an entirely different scheme (*i.e.*, Petrobras and Sete's scheme to defraud EIG). [(Br.45-47.)] This Court has recognized that conflating different types of wrongdoing in this manner is insufficient to show interdependence. In *Filler v. Hanvit Bank*, for example, this Court recognized that evidence of substantial assistance in "falsif[ying] . . .

45

revenues" for one of the fraudster's branch entity's accounts was not equivalent to substantial assistance in an independent fraud made by the fraudster in its "financial statements and press releases". 156 F. App'x 413, 417 (2d Cir. 2005). Similarly, in *Kirschner v. Bennett*, the district court rejected plaintiff's efforts to "equate a defendant's knowledge of or participation in" a round-trip loan scheme with third parties that helped the fraudster (Refco) appear as though it had fewer receivables at the end of its reporting periods with participation in an independent scheme at Refco, which resulted in client funds being siphoned off for financial engineering. 648 F. Supp. 2d 525, 544-45 (S.D.N.Y. 2009).

Here, Keppel's participation in the bribery scheme not only did not substantially assist Petrobras and Sete's investment fraud on EIG, but it also had no impact on whether Petrobras and Sete would go on to mislead EIG. The District Court properly identified this in its conclusion, finding that "the investment fraud that Petrobras and Sete perpetrated on EIG was not dependent on the bribery scheme, or on Keppel's payment of bribes." [(ECF_158_at_36-37 (Opinion.36-37).)]

EIG's contrary arguments on appeal again ignore this Court's precedent governing interdependent schemes. Indeed, EIG's proposed interdependent scheme test disregards the requirement that the parties in question were participants in related, symbiotic frauds—something the evidence does not

46

support here. In particular, this Court has previously affirmed decisions holding that a defendant must be "intertwined with" the fraudster to establish an interdependent scheme. *In re Refco Inc. Sec. Litig.*, No. 07-MD-1902(JSR), 2012 WL 12941970, at *11 (S.D.N.Y. Feb. 10, 2012), *aff'd sub nom. Krys v. Pigott*, 749 F.3d 117 (2d Cir. 2014). This might be established with evidence that the parties were in a "'symbiotic' relationship" or that the defendant "actively played a role" in the underlying fraud. *Fraternity Fund*, 479 F. Supp. 2d at 371 n.115 (quoting *ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308, 1330 (S.D.N.Y. 1997)). Courts also look to whether the defendant had a direct relationship or communication with plaintiffs or whether they were further removed from the victims. *In re Refco*, 2012 WL 12941970, at *11. The through line in all of these cases is straightforward: Even if a defendant took part in one aspect of a complex fraud, they cannot be deemed to have provided substantial assistance unless they directly aided the "operative fraud that caused plaintiffs' harm". *Hightower v. Cohen*, No. CV-08-3229(RJD)(RM), 2009 WL 9042127, at *5 (E.D.N.Y. Sept. 30, 2009). In *In re Refco*, another case related to the Refco fraud, while the round-trip loans defendants were involved in allowed Refco to present a false financial picture and to defraud plaintiffs, the court held that no interdependence was shown because the defendants were not "intertwined" with

47

Refco, lacked any "relationship" with the victims of the fraud and did not profit directly from the victims. 2012 WL 12941970, at *2, *11.

That standard is not remotely met here, where Keppel was at all times an independent entity vis-à-vis Petrobras and Sete with no direct stake in the investment fraud on EIG. In fact, EIG's own recitation of facts demonstrates that Keppel was not an insider when it came to Sete's plans and operations. In January 2011, Keppel's Chairman directed employees to find out "[w]ho actually owns SETE . . . Who are the other private entities that will own the rest of the company" [(Br.10)], and in March 2012, various members of Keppel's management team discussed the need to "find out as much as possible" about Sete's efforts to raise additional funds [(Br.15)]. Keppel also had no relationship with EIG, and its interactions with EIG personnel were limited to the three shipyard tours of its Brazilian subsidiary BrasFELS in August 2011, March 2012 and June 2013 for the purpose of demonstrating Keppel's competence to build the drillships. None of this suggests Keppel was "intertwined with" Sete.

Finally, compensation from a fraudster to a co-defendant does not create interdependence. *See In re Refco*, 2012 WL 12941970, at *1, *11 (holding plaintiffs had not alleged an "intertwined" fraudulent scheme even though defendants profited from the fraudster). Here, EIG does not point to any tangible connection between EIG's payments to Sete and Keppel's kickbacks beyond

48

Petrobras and Sete's participation. All EIG argues is that the kickbacks overlapped temporally with its investment in Sete. [(Br.46.)]

**2. The District Court Properly Distinguished Cases Where Interdependent Schemes Exist.**

EIG's effort to compare this case to *Nathel* and *ABF/Askin* falls flat. As the District Court properly identified, those cases are distinguishable on several grounds. Not only were both cases decided at the pleading stage and therefore do not speak to whether the evidence is sufficient to survive summary judgment [(ECF_158_at_34 (Opinion.34))], they also relied on schemes in which the defendants played "key roles" that were necessary to perpetrate the underlying fraud [(ECF_158_at_36 (Opinion.36))]. The District Court properly concluded that "[w]hile Petrobras, Sete, and Keppel all benefited from the bribery scheme, the investment fraud that Petrobras and Sete perpetrated on EIG was not dependent on the bribery scheme, or on Keppel's payment of bribes", and "[t]he instant case therefore does not involve the sort of 'symbiotic fraudulent scheme' at issue in *ABF*, *Askin*, and *Nathel*." [(ECF_158_at_36-37 (Opinion.36-37).)]

In *ABF Capital Management v. Askin Capital Management, L.P.*, plaintiffs invested in funds that made leveraged investments in volatile mortgage-backed securities. 957 F. Supp. at 1314. The fraudster actively marketed interests in these funds and made representations about how it would vet investment

decisions—statements which ultimately would prove to be misrepresentations geared towards inducing investment. *Id.* at 1315.

In finding that the plaintiffs had pled interdependent fraud, the district court in *ABF* focused on allegations that the broker-defendants sold the fraudster high-risk securities while knowing that the fraudster had promised to purchase low-risk/high-quality investments, making millions of dollars in the process. *Id.* at 1315-16. Thus, the plaintiffs there alleged an entirely "symbiotic scheme" where the defendant-brokers essentially created a market for these securities (so the fraudster could sell them) and in return relied on the fraudster to purchase these "nuclear waste" securities to fund their activities. *Id.*

Here, EIG does not and cannot allege, let alone establish through evidence, that Keppel relied on EIG's investments in Sete to fund its bribery scheme with Petrobras and Sete. As the District Court properly found, "[t]here is no evidence that investor money—much less EIG's investment in particular—was necessary to finance the bribes Petrobras paid to public officials or the bribes Keppel paid to Sete." [(ECF_158_at_37 (Opinion.37).)] For one thing, the bribery scheme existed long before EIG's investments. Moreover, Petrobras and Sete in no way required Keppel's participation in order to defraud investors. To the contrary, Keppel executed routine shipbuilding duties alongside four other companies Petrobras and Sete engaged. Critically, there is no allegation (not to

50

mention evidence) that those duties facilitated Petrobras and Sete's fraud or even that Keppel's statements about its ability to fulfill those duties were in any way false.

*Nathel v. Siegal* is similarly distinguishable. There, plaintiffs alleged they were fraudulently induced to invest in oil and gas partnerships. 592 F. Supp. 2d 452, 470 (S.D.N.Y. 2008). Two of the defendants worked with the primary fraudster to make the partnership appear legitimate by holding themselves out to be oil and gas experts when in reality they were a day camp director and an attorney. *Id.* at 459. These defendants feigned their roles for the express purpose of inducing investment. *Id.*

In contrast, the evidence shows that Keppel made no comparable affirmative misrepresentations to EIG. The core interactions between Keppel and EIG involved Keppel's representations regarding its competence to build the drillships in Brazil—all of which are demonstrably accurate. The bribery scheme was not the subject of Keppel's interactions with EIG, nor was that the focus of EIG's inquiries directed to Keppel such that EIG could prove reliance on Keppel's actions to show Keppel substantially assisted Petrobras and Sete's broader fraudulent enterprise. Indeed, Keppel at all times was performing a legitimate business service and was involved in a "real project to build offshore oil drilling

51

equipment" that is entirely distinguishable from the role the aider and abettors in
*Nathel* played.  [(ECF_158_at_36 (Opinion.36).)]

### B. The District Court Appropriately Found that Keppel Did Not Participate in the Preparation of Specific Fraudulent Statements.

EIG next accuses the District Court of focusing too narrowly on
whether Keppel participated in the preparation of certain fraudulent statements,
arguing that, once the District Court ruled out the existence of an interdependent
scheme, it improperly "confine[d] the substantial assistance element to acts
involving the preparation of fraudulent documents only".  [(Br.49.)]  But—as with
its arguments concerning actual knowledge—EIG's argument ignores that its entire
fraud case is premised on these very documents EIG claims to have read and relied
on in deciding to invest in Sete.  Thus, to prove substantial assistance in that
particular fraud (*i.e.*, investment fraud), EIG must show that Keppel substantially
assisted in the creation of these documents.  EIG does not dispute that Keppel has
not.

EIG's long and confusing statement of facts attempts to mask how
limited and attenuated its fraud claims are, but the District Court properly distilled
EIG's allegations down to these six documents, and thus its substantial assistance
claims must be limited to these six documents as well.  It is well established that
"in the context of an aiding and abetting claim, where the alleged primary
violations consist of misrepresentations in a document, the defendant must be

alleged to have given substantial assistance to the making and dissemination of that document." *Fraternity Fund*, 479 F. Supp. 2d at 371; *Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989) (same). And because there is no suggestion that Keppel transmitted any of these documents to EIG, the only relevant question is whether there is any evidence that Keppel played any role in preparing these documents. EIG concedes, as it must, that there is no evidence Keppel even saw four of the six documents, and as the District Court correctly observed, there is no evidence Keppel drafted any of them. [(*See* ECF_158_at_15-16, 33 (Opinion.15-16, 33).)]

EIG's reliance on cases involving other kinds of fraudulent schemes, in which courts evaluated conduct other than defendant's role in preparing alleged fraudulent misstatements, is misplaced. [(Br.51-52.)] These cases are readily distinguishable from the facts here because in each case the defendant played a substantial role in inducing and securing Plaintiffs' investment.

For example, in one of EIG's key cases, the defendant-CEO told the company's investors that the defendant-company had verified the "concept and operating assumptions" of the investment and was in "complete control". *Gabriel*, 94 F. Supp. 2d at 509. Furthermore, the defendant actively participated in "roadshows", which were one of the primary vehicles for deceiving investors and

53

inducing them to invest. *Id.* at 495. In contrast, Keppel made no representations to induce EIG's investment.

Similarly in *In re Par Pharmaceuticals Inc. Securities Litigation*, the subsidiary-defendant was majority owned by the fraudster, had actual knowledge of misleading statements made to investors and engaged in bribery for the purpose of aiding the fraudster in deceiving investors, and not just for the subsidiary's own financial gain. 733 F. Supp. 668, 682 (S.D.N.Y. 1990). In particular, the bribery scheme in question, which involved obtaining FDA approvals, directly inflated the fraudster's stock value and encouraged unwarranted investment. *Id.* at 673. Here, in contrast, Keppel was an independent entity with no direct stake in Petrobras and Sete's investment fraud on EIG. Moreover, Keppel's provision of kickbacks to Sete, while illegal, is not what induced EIG's investment in Sete, nor was it the main basis on which Petrobras and Sete promoted the investment opportunity.

### C. The District Court Independently Addressed Misstatements and Omissions Alleged by EIG and Properly Dismissed Each.

The District Court explicitly considered the four alleged categories of substantial assistance cited by EIG and properly rejected them on grounds not challenged by EIG: (1) the shipyard tours to BrasFELS; (2) Keppel's compliance statements in its EPC contracts with Sete; (3) Keppel's anti-corruption letters; and (4) Keppel's public denials of wrongdoing.

### 1. Keppel Made No Affirmative Misrepresentations During the Shipyard Tours and Owed No Duty To Disclose.

The District Court properly noted that EIG's theory with respect to the shipyard tours is based on non-disclosure. [(ECF_158_at_38 (Opinion.38).)] Indeed, EIG relies solely on Keppel's silence as to its ongoing bribery for the proposition that Keppel affirmatively assisted and helped Petrobras and Sete conceal from EIG their investment fraud. But, as the District Court found, and EIG does not dispute on appeal, Keppel had no legal duty to disclose. [(ECF_158_at_37-38 (Opinion.37-38).)]; *see also Hightower*, 2009 WL 9042127 at *7 ("Absent a fiduciary duty or some other independent duty owed by [defendants] to plaintiffs, aiding and abetting liability will not attach where . . . the crux of plaintiffs' claims is that [defendants] failed to disclose certain information in an offering memoranda."); *Markowits v. Friedman*, 42 N.Y.S.3d 218, 222 (App. Div. 2d Dep't 2016) (same); *Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*, 883 N.Y.S.2d 486, 489-90 (App. Div. 1st Dep't 2009) ("[P]laintiffs' claim . . . that Credit Suisse assisted in the alleged fraud by failing to disclose Meridian's insolvency. . . . is insufficient to support a claim of aiding and abetting fraud absent a fiduciary duty or some other independent duty owed by Credit Suisse to the plaintiffs.").

Keppel was under no legal duty to "detect and thwart" Petrobras and Sete's independent fraud. *In re Agape Litig.*, 681 F. Supp. 2d 352, 365 (E.D.N.Y.

2010).  And substantial assistance "means more than just performing routine business services for the alleged fraudster."  *CRT Invs., Ltd. v. BDO Seidman, LLP*, 925 N.Y.S.2d 439, 441 (App. Div. 1st Dep't 2011).  The shipyard tours were just that—routine business services.

Rather than attempt to establish some sort of duty on appeal, EIG asserts that Keppel's non-disclosure during the visits to BrasFELS "affirmatively assisted Petrobras and Sete's" fraudulent scheme and played a "substantial role in assisting the due diligence efforts of Sete's potential investors, including EIG, and lending credibility to an investment in Sete." [(Br.53-54.)]  But EIG does not—and cannot—demonstrate that Keppel provided the shipyard tours for the purpose of furthering Petrobras and Sete's investment fraud.  *In re Agape Litig.*, 773 F. Supp. 2d at 324 (holding that the use of a bank's remote check depositing system by a fraudster does not imply that the bank "provided them with the service to accomplish that goal").  Nor can EIG point to any facts to support its assertion that the shipyard tours were "intentionally designed to aid the fraud". [(Br.55.)]

All the facts EIG adduces indicate that both Keppel and EIG understood the purpose of the shipyard tours was to facilitate due diligence concerning Keppel's technical capabilities and progress and "to give [potential Sete investors] comfort that these ships could be built in Brazil". [(Br.16, 55.)]  In short, the tours were not meant to determine whether Petrobras and Sete were

56

engaged in fraud or whether bribes were being paid. EIG does not claim—nor could it given that EIG's representatives did not even ask about corruption or compliance during the visits—that Keppel deceived anyone in that regard. Furthermore, EIG cannot and does not allege that Keppel made any misrepresentations with regard to its engineering capacities.

Finally, the supposed comparable authority that EIG relies on involves a fraudster overselling the value of the product it offered, which was at the center of the alleged scheme. In *Gabriel*, the defendant-CEO deceived investors regarding the expertise and guidance the fraudsters would receive in building a steel mill that was itself the primary investment opportunity. 94 F. Supp. 2d at 498. Similarly, an auction house's fraudulent omission of a fraudster's name in materials describing the provenance of artwork and "Sotheby's executives' heavy involvement in the negotiations" were intended to convince potential buyers that proposed prices for the art pieces were fair and accurate. *Accent Delight Int'l Ltd. v. Sotheby's*, 2023 WL 2307179, at *24. Here, EIG offers no evidence, or even coherent argument, as to how Keppel's representations about its capacity to deliver drillship construction services misled EIG, nor any evidence as to how such statements were in any way false.

### 2. The District Court Properly Rejected EIG's Argument That Keppel's Consulting Agreements Constitute Substantial Assistance.

The District Court also properly rejected EIG's reliance on supposed collusion between Keppel and Skornicki. [(ECF_158_at_38-39 (Opinion.38-39).)] Critically, EIG does not point to any evidence that Keppel either knew or intended that such collusion would result in concealing bribes from EIG. Instead, EIG says the District Court improperly assumed that Keppel did not know about the underlying fraud. [(Br.56-57.)]

EIG's contentions are both incorrect and irrelevant. As to the former, EIG has adduced no evidence whatsoever of actual knowledge on the part of Keppel. (*See supra* Section II.) Moreover, even if Keppel knew about the underlying investment fraud being perpetrated by Petrobras and Sete, there is still no evidence that Keppel entered into its agreements with Skornicki for the purpose of concealing the fraud from EIG. In fact, Keppel's contracts with Skornicki long pre-date the investment fraud scheme. And it is well-established that actions not taken "in an effort" to further the underlying fraud cannot constitute substantial assistance. *Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 547 (S.D.N.Y. 2007).

### 3. The District Court Properly Rejected EIG's Reliance on Keppel's Anti-Corruption Declarations and Public Denials of Wrongdoing.

The District Court found Keppel's January 16, 2015 "anticorruption letters" to be "irrelevant" because, among other things, they post-date EIG's last

investment in Sete and there is no evidence that EIG saw the letters, let alone relied on them. [(ECF_158_at_33 (Opinion.33).)] Similarly, the District Court found that Keppel's February 2015 public denials of wrongdoing were made long after EIG had made its last payment to Sete in connection with its investment. [(*Id.*)]

Indeed, EIG could not possibly have relied on either the anti-corruption declarations or Keppel's public denials of wrongdoing when deciding to invest in Sete because they were made after EIG finalized its investment. Specifically, it is undisputed that: (a) EIG's final cash disbursement to Sete was on January 6, 2015 [(ECF_158_at_9 (Opinion.9))]; (b) the anticorruption letters were finalized and executed on January 16, 2015 [(ECF_158_at_18-19 (Opinion.18-19))]; and (c) Keppel's first public denial of wrongdoing took place on February 9, 2015 [(ECF_158_at_19, 33 (Opinion.19, 33))].

It is well established in the law—and common sense—that statements which post-date investments cannot be the basis upon which a plaintiff made its investment decision. *KDH Consulting Grp. v. Iterative Cap. Mgmt. L.P.*, 528 F. Supp. 3d 192, 206 (S.D.N.Y. 2021) (holding plaintiffs "cannot rely on misstatements that postdate the initial investment decision, as these misstatements are not made in connection with the purchase or sale of securities"); *Paraflon Invs., Ltd. v. Fullbridge, Inc.*, 960 F.3d 17, 26 (1st Cir. 2020) ("When . . . a plaintiff alleges that the defendant's misrepresentations or omissions induced its

investment, New York law indicates that the defendant's state of mind . . . should be assessed up until the date of the plaintiff's investment."); *High Tides, LLC v. DeMichele*, 931 N.Y.S.2d 377, 381 (App. Div. 2d Dep't 2011) ("[A]lleged misrepresentations and omissions may not form the basis for the plaintiff's fraud claims to the extent that they were made after [the] investment, since the element of reliance is necessarily absent.").  Thus, EIG cannot possibly establish substantial assistance by Keppel on the basis of these statements that occurred after it invested.

### 4. The District Court Properly Rejected EIG's Reliance on the EPC Contracts.

The District Court properly concluded that the EPC contracts are similarly "irrelevant" and do not "constitute[] or effect[] a fraud on EIG" because, among other things, the drafts that EIG reviewed were prepared by Petrobras and/or Sete and not by Keppel, do not mention Keppel by name, there is no evidence that EIG ever reviewed or relied on them in connection with its decision to invest in Sete [(ECF_158_at_33 (Opinion.33))], and "[t]here is no evidence that Keppel intended its statements to conceal the bribery scheme from EIG" [(ECF_158_at_39 (Opinion.39))].

In discussing the EPC contracts, EIG makes the bizarre argument that the District Court "improperly blurred the line between conduct giving rise to fraud, which requires plaintiffs' reliance on defendant's misstatements, and aiding-

and-abetting conduct, which does not." [(Br.59.)] In essence, EIG argues that a defendant can in fact aid and abet a fraud through conduct that occurred after the fraud has occurred, a position that makes no sense.

In order to establish liability for aiding and abetting, the plaintiff has to first establish a fraud and then show that the defendant aided and abetted that fraud. Here, EIG alleges that the fraud occurred through certain specific misstatements by Petrobras and/or Sete, all of which occurred before Keppel signed the EPC contracts with Sete. The signing of those contracts therefore cannot possibly have aided and abetted the fraud alleged by EIG.

In other words, the issue is substantial assistance of the fraud alleged, which was complete before these documents were executed. "In the aiding and abetting context, a plaintiff must allege that the defendant's substantial assistance in the primary violation proximately caused the harm on which the primary liability is predicated." *Fraternity Fund*, 479 F. Supp. 2d at 370-71 (holding that plaintiffs who did not allege defendant's actions *caused* their investment did not sufficiently allege substantial assistance); *see also Paraflon*, 960 F.3d at 26 ("Even if post-investment developments might be said to trigger some disclosure duty on the defendant's part, misrepresentations or omissions about such events are generally of no consequence in an action premised on fraudulent inducement of an investment."). It is impossible for EIG to establish proximate cause based on

documents that did not exist at the time that EIG completed its due diligence and made its decision to invest in Sete.

## CONCLUSION

For the foregoing reasons, the Order of the District Court should be affirmed.

October 18, 2024

CRAVATH, SWAINE & MOORE LLP,

by

_____/s/ *Peter T. Barbur*_____
Peter T. Barbur
Rachel G. Skaistis

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

*Attorneys for Defendant-Appellee*
*Keppel Offshore & Marine Ltd.*

**CERTIFICATE OF COMPLIANCE PURSUANT TO
FED. R. APP. P. 32(a)(7)(C)**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,985 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

October 18, 2024

/s/ *Peter T. Barbur*
Peter T. Barbur